**Jeremy LOUGHRAN, Appellant**

v.

**THE PHILLIES and Marlon Byrd, Appellees.**

Superior Court of Pennsylvania.

Argued Sept. 14, 2005.

Filed Nov. 23, 2005.

Steven E. Wolfe, Holland, for appellant.

Robert Foster, King of Prussia, for appellees.

Before: MUSMANNO, BENDER, and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶ 1 This is an appeal from an order granting summary judgment in favor of appellees.[1] Appellant claims the trial court misapplied the "no duty" rule in finding that a spectator at a major league baseball game is not owed a duty by either the team or individual player to protect against a ball thrown into the stands; and that the trial court incorrectly found that his injury was an inherent risk of attending the game. We disagree with appellant, and affirm the order of the trial court.

¶ 2 On July 5, 2003, Jeremy Loughran (appellant) attended a baseball game between the Philadelphia Phillies (Phillies) and the Florida Marlins. Appellant's

---

**1.** Because the summary judgment motion and all corresponding filings were made by both Marlon Byrd and the Philadelphia Phillies, we will refer to them collectively as "appellees."

Brief, at 5. At the end of the top half of the seventh inning, appellant was injured when Philadelphia centerfielder, Marlon Byrd, after catching a ball for the last out, threw the ball into the stands. *Id.* Appellant was treated twice at the Veterans Stadium Infirmary and later at St. Mary's Medical Center. *Id.* at 6. Appellant's immediate injuries included bleeding around his left eye, a concussion, facial contusions, and abrasions.[2] *Id.* Appellant has since been treated for severe headaches, vomiting, confusion, incoherence, hallucinations, loss of balance, head and neck pain, photophobia, eye spasms, sleep disruption, and depression. *Id.*

¶ 3 Appellant filed the current negligence action against Byrd and the Phillies on March 8, 2004 and on March 8, 2005, the trial court granted summary judgment in favor of appellees, holding that "the applicable law clearly states that recovery is not granted to those who voluntarily expose themselves to risks by participating in or viewing an activity." Trial Court Opinion, 5/3/2005, at 1. This timely appeal follows.

¶ 4 Our standard of review of an order granting or denying a motion for summary judgment is well established:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the

moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Sackett v. Nationwide Mut. Ins. Co.*, 880 A.2d 1243 (Pa.Super.2005).

¶ 5 On appeal, appellant lists five separate "questions involved." *See* Appellant's Brief, at 4. For purposes of our review, however, they can be combined into one issue: whether the trial court's application of the "no duty" rule to this case was proper.[3]

¶ 6 We must first note that appellant's claim was brought under a negligence theory. It is axiomatic to say that in order to succeed on a negligence claim, the four basic elements of duty, breach, causation, and damages must be established. Appellees moved for summary judgment on the grounds that "as a matter of law, [appellees] did not owe a duty to [appellant] to protect him from the risk of being struck by a thrown baseball while sitting in the stands, [and that] [appellant] assumed the risk of being struck by a thrown ball by sitting in an area where he knew balls could be thrown." Defendant's Motion for Summary Judgment, 1/4/2005, at ¶¶ 22, 23 (Docket Entry 24).

---

**2.** The bleeding was immediately treated at the infirmary. Appellant refused ambulance transport to a local hospital, and instead was driven to St. Mary's Medical Center by his girlfriend. It was at St. Mary's that appellant was diagnosed with a concussion and facial contusions. Appellant's Brief, at 6.

**3.** Specifically, appellant posits the questions: 1) Whether a spectator at a baseball game

assumes the risk of being struck in the face by a ball; 2) Whether being struck in the face by a ball is an inherent risk of attending a game; 3) Whether the "no duty" defense is available to appellees; 4) Whether the "no duty" rule was properly applied; and 5) Whether summary judgment was appropriate. Appellant's Brief, at 4.

¶ 7 In explaining its application of the "no duty" rule, the trial court noted that appellant failed to show that appellees "deviated from an established custom in the game of baseball" in tossing a ball to the fans, and therefore appellant could not escape its application. Trial Court Opinion, 5/3/2005, at 5. The trial court further explained that regardless of appellant's claimed ignorance as to the possibility of a ball reaching the seats via a player's throw, he still could be said to have assumed that risk because it was an inherent risk in attending a baseball game. *Id.* at 4 (citing *Schentzel v. Philadelphia National League Club,* 173 Pa.Super. 179, 96 A.2d 181 (1953)).

¶ 8 We think it necessary to first examine the nature of the "no duty" rule and specifically, its application on the baseball diamond. We have previously stated that "[t]he operator of a place of amusement is 'not an insurer of his patrons,' and therefore, patrons will only be able to recover for injuries caused by the operator's failure to exercise 'reasonable care in the construction, maintenance, and management of the facility.'" *Romeo v. The Pittsburgh Associates,* 787 A.2d 1027 (Pa.Super.2001) (quoting *Jones v. Three Rivers Management Corp.,* 483 Pa. 75, 394 A.2d 546 (1978)). The "no duty" rule applies to bar a plaintiff's claims for injuries suffered as a result of common, frequent and expected risks inherent during the activity in question. *Jones v. Three Rivers Management Corp.,* 483 Pa. 75, 394 A.2d 546 (1978). "Only when the plaintiff introduces adequate evidence that the amusement facility in which he was injured *deviated in some relevant respect from established custom* will it be proper for an 'inherent-risk' case to go to the jury." *Id.* at 550. It can be said that the "no duty" rule has evolved into a modified version of the assumption of the risk doctrine, which has been largely abolished in Pennsylvania. *Romeo v. The Pittsburgh Associates,* 787 A.2d 1027 (Pa.Super.2001).

¶ 9 Appellant first challenges the trial court's finding that his being hit by a ball thrown by the centerfielder is an inherent risk. Appellant argues that his injuries were not the result of "a throw that could in any way be construed as a common, frequent or expected part of the game." Appellant's Brief, at 13. In support of this argument, appellant offers that "he had never seen an outfielder throw a ball into the seats; that he had never seen a player throw a ball overhand into the seats from any location on the field; and that he was completely surprised by Byrd's throw into the stands, and was not expecting an outfielder to throw a ball into the crowded outfield seats after play had ended." *Id.* at 13.

¶ 10 Appellant correctly surmises that the application of the "no duty" rule hinges on whether the activity in question is a "common, frequent, or expected part of the game." He argues that because the third out had been made, the inning was over, and therefore Byrd's throw can neither be expected, nor even part of the game. When determining what is "customary" part of the game, it is our opinion that we cannot be limited to the rigid standards of the Major League Baseball rule book; we must instead consider the actual everyday goings on that occur both on and off the baseball diamond; we must consider as "customary" those activities that although not specifically sanctioned by baseball authorities, have become as integral a part of attending a game as hot dogs, cracker jack, and seventh inning stretches. Fans routinely arrive early for batting practice in hopes of retrieving an errant baseball as a souvenir, and fans routinely clamor to retrieve balls landing in the stands via home runs or foul balls.

Although not technically part of the game of baseball, those activities have become inextricably intertwined with a fan's baseball experience, and must be considered a customary part of the game. Similarly, both outfielders and infielders routinely toss caught balls to fans at the end of an inning.

¶ 11 We note that during the particular game in question, there were at least twenty (20) occasions of a ball entering the stands. Defendant's Motion for Summary Judgment, 1/4/2005, at ¶ 13 (Docket Entry 24). At least two of those balls were thrown to fans near appellant by players. *Id.* at ¶¶ 13(f), 13(i). Appellant admits to having attended numerous baseball games in the past, and to having witnessed balls tossed into the stands on previous occasions. N.T., 10/29/2004, Oral Deposition of Jeremy Loughran, at 57–60. Regardless of appellant's current contention that he did not directly see the balls thrown into the stands by the players, our courts have held that even a first-time spectator at a baseball game is imputed with the common or "neighborhood knowledge" of the risks of the game. *Schentzel v. Philadelphia National League Club*, 96 A.2d at 186.

¶ 12 Appellant also argues that if the trial court's decision stands, baseball fans could be said to have assumed the risk of injuries from "a resin bag, baseball glove, baseball bat, spiked shoe, catcher's mask, or some other object that may be intentionally thrown into the stands by a player." Appellant's Brief, at 14. We cannot agree with appellant's contention that the analysis of a spiked shoe or catcher's mask

thrown into the stands would be the same as the current situation, as players are not regularly booed for failing to throw their shoes or equipment into the stands, nor are fans routinely seen clamoring or jockeying for position to retrieve a thrown shoe or mask. Likewise, as previously stated, the "no duty" rule applies only to "common, expected, and frequent" risks of the game; players do not commonly throw their spiked shoes into the stands following an out.

¶ 13 We agree with the trial court that the injuries received by appellant from actions taken by Phillies centerfielder Byrd constituted an inherent risk of the game. Countless Pennsylvania court cases have held that a spectator at a baseball game assumes the risk of being hit by batted balls, wildly thrown balls, foul balls, and in some cases bats. *See Schentzel v. Philadelphia National League Club*, 173 Pa.Super. 179, 96 A.2d 181 (1953); *Iervolino v. Pittsburgh Athletic Co.*, 212 Pa.Super. 330, 243 A.2d 490 (1968). *See also, Dalton v. Jones, et al.*, 260 Ga.App. 791, 581 S.E.2d 360 (2003) (holding that the doctrine of assumption of risk precluded recovery from the Atlanta Braves and their centerfielder when the centerfielder tossed a ball to fans in between innings, resulting in a permanent eye injury to a spectator). Even a casual baseball spectator would concede it was not uncommon for a player to toss a memento from the game to nearby fans. While appellant makes much of the manner in which the ball was thrown,[4] and warns of the slippery slope the trial court's decision could result

---

4. Throughout his brief to this Court, appellant uses the words "forcefully," "with sufficient force," "overhand," "arbitrarily," "unexpectedly," "intentionally," and "carelessly" to describe the manner in which Byrd threw the ball into the stands. There was no testimony regarding the force at which the ball injuring appellant was thrown, nor how it compared

to the other balls reaching the stands; and it does not appear that Byrd's intent to throw the ball as a souvenir was ever questioned. Additionally, appellant admittedly did not see the ball as it was thrown, and could not testify as to it being thrown overhand or underhand. N.T., 10/29/2004, Oral Deposition of Jeremy Loughran, at 57–60.

in, he fails to establish that Byrd or the Phillies deviated from the *common and expected* practices of the game of baseball or acted in a manner which would take them out of the purview of the "no duty" rule.

¶ 14 Because we find that the trial court did not err in applying the "no duty" rule to the case at bar, we must affirm its grant of summary judgment.

¶ 15 Order AFFIRMED.

¶ 16 Dissenting Opinion by BENDER, J.

BENDER, J., dissenting:

¶ 1 I respectfully dissent. In the present case, on July 5, 2003, Appellant attended a Philadelphia Phillies game and was seated in the outfield stands. With two outs in the Florida Marlins seventh inning, a ball was hit to the Phillies' centerfielder, Marlon Byrd. Byrd caught the fly ball that ended the Marlins inning and, as one would expect after recording the final out of an inning, Byrd began running off the field toward the Phillies' dugout. However, after Byrd took a few strides he turned and threw the ball, overhand, into the stands where it struck a spectator in the face and, allegedly caused considerable injury. The evidence is clear that the ball was not thrown into the stands accidentally while in the course of game play. Had it been, I would readily join the Majority's disposition. But, as I see it, and as I believe the law sees it, there is a difference between a ball that enters the stands on an errant throw during game play and one thrown into the stands gratuitously and outside the parameters of game play.

¶ 2 As the Majority notes, the assumption of the risk doctrine has been largely abolished in Pennsylvania. However, to be more precise, one might assert that the assumption of the risk doctrine was finally abolished, at least in most part, in the case of *Hughes v. Seven Springs Farm, Inc.,* 563 Pa. 501, 762 A.2d 339 (2000). Prior to that time, appellate courts in the Commonwealth had considered the premise that the passage of the Comparative Negligence Act[5] had spelled the end of the assumption of the risk doctrine without definitively deciding the issue. The Supreme Court had at least twice handed down decisions purporting to abolish the doctrine due to its attendant "difficulties" and "complexities," but those cases, *Howell v. Clyde,* 533 Pa. 151, 620 A.2d 1107 (1993) and *Rutter v. Northeastern Beaver County School District,* 496 Pa. 590, 437 A.2d 1198 (1981), failed to gain a majority of the Court. Thus, despite the presence of many detractors, the doctrine survived and was a viable defense as late as the year 2000. *Bullman v. Giuntoli,* 761 A.2d 566 (Pa.Super.2000). In *Hughes,* the Supreme Court, without noting that *Howell* lacked precedential value, cited that case nonetheless in announcing that the doctrine had been abolished except for statutory exceptions. One such statutory exception related to operators of ski slopes, which was of particular relevance in *Hughes* as the defendant there was the operator of a ski resort located in the Laurel Mountains of southwestern Pennsylvania. Since *Hughes* was a unanimous decision, it now appears safe to state that the assumption of the risk doctrine has, in fact, finally been abolished in Pennsylvania. Or has it?

¶ 3 A year after *Hughes* announced that the doctrine of assumption of the risk had been abolished as a common law defense, a panel of this Court essentially resurrected the essence of the assumption of the risk doctrine, at least as it applied to profes-

5. 42 Pa.C.S. § 7102(a)-(b).

sional baseball clubs, in *Romeo v. Pittsburgh Associates*, 787 A.2d 1027 (Pa.Super.2001). The panel accomplished this by simply applying the so called "no duty" rule set forth in *Jones v. Three Rivers Management Corp.*, 483 Pa. 75, 394 A.2d 546 (1978), a case decided under law existing prior to the passage of the Comparative Negligence Act and before there was any movement toward abolishing the doctrine of assumption of the risk.

¶ 4 In *Romeo*, a panel of this Court concluded that a woman who had been struck by a batted ball at a Pittsburgh Pirates game had, as a matter of law and not as a matter of a failure of proof, no cause of action against the Pittsburgh Pirates Baseball Club. In reaching the conclusion that the plaintiff had not stated a cause of action upon which recovery could be granted, the panel concluded that the Pirates owed no duty to protect the plaintiff from the risk of being struck by a batted ball. On its face, this statement seemingly differed from the conclusion that the plaintiff, in going to the game, had "assumed the risk" of being struck by a batted ball. However, the panel's discussion of the law supporting this decision invoked many terms familiar to readers of assumption of the risk cases. Indeed, the panel cited a passage from *Carrender v. Fitterer*, 503 Pa. 178, 469 A.2d 120 (1983), in which Chief Justice Roberts noted that the assumption of the risk doctrine is merely another way of stating the fact that the possessor/operator owes no duty to an invitee.[6] Although drawing the parallel between the two "rules" and seemingly acknowledging that the difference is merely a matter of phraseology,[7] the *Romeo* decision proceeded as if the so called "no duty" rule had survived abolishment in *Hughes*. I would submit that this is a dubious conclusion.[8]

6. The passage from *Carrender* reads, in relevant part:

It is precisely because the invitee assumes the risk of injury from obvious and avoidable dangers that the possessor owes the invitee no duty to take measures to alleviate those dangers. Thus, to say that the invitee assumed the risk of injury from a known and avoidable danger is simply another way of expressing the lack of any duty on the part of the possessor to protect the invitee against such dangers.

*Id.* at 125.

7. The *Romeo* panel stated: "The 'no-duty' rule set forth in *Jones* clearly incorporates the concept of assumption of the risk utilized in earlier cases." *Romeo*, 787 A.2d at 1031.

8. That recovery for injury resulting from being struck by a batted ball has been most often precluded on the basis of assumption of the risk can be seen from the Supreme Court's quotation of the Restatement of Torts in summarizing the various types of assumption of the risk cases. The quoted passage follows:

The Restatement Second of Torts, § 496A, summarizes the general principle of assumption of the risk as follows: "A plaintiff who voluntarily assumes a risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm." In practice, the doctrine was more complicated. The comment to the Restatement notes that the doctrine has been used by the courts "in at least four different senses, and the distinctions seldom have been made clear." *Id.* § 496A comment C. Those four meanings are summarized in the comment as follows:

2. A second, and closely related, meaning is that the plaintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances. Thus a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball. Again the legal result is that the defendant is relieved of his duty to the plaintiff.

*Hughes*, 762 A.2d at 341. It appears clear that the Restatement regards the facts of *Romeo* to fall within the assumption of the risk doctrine which *Hughes* indicates has been

¶ 5 Nevertheless, putting aside the ability of a panel of this court to effectively reinstate a doctrine that has been abolished by the Supreme Court, the more dangerous aspect of today's decision is the extension of the rule the Majority provides by today's holding. Assuming the so called "no duty" rule set forth in *Jones* survived *Hughes*, it appears undisputed by all parties that had Appellant been sitting low in the stands behind third base and struck by an overthrown ball thrown by an outfielder intending to throw out a runner at third, he would have no cause of action as he is presumed to have assumed the risk of being hit by such a ball, the ball having entered the stands in the course of normal play. Stated in the guise of the no duty rule, neither The Phillies Baseball Club nor Marlon Byrd would have a duty to ensure that a throw made in the course of game play would not stray from its intended target and strike a fan seated in the seats near play. Imagine the consequences of a contrary rule.

¶ 6 If a baseball player owed a duty of care to ensure that a thrown or batted ball would not strike a patron, he might hesitate in attempting to throw out a runner trying to stretch a double into a triple for fear of the ball "sailing" on him and striking a patron. Similarly, a player might think twice about attempting to hit an inside pitch for fear of pulling it into the stands and smacking a spectator, and a batter might look at a called strike on the outside corner as opposed to "protecting the plate" because he knows from experience that hitting a pitch on the outside corner can lead to a screaming foul in the direction he is facing. Of course, it would be ridiculous to impose such a duty of care upon a player participating in a sporting event. The game of baseball would be forever changed. Similarly, if a duty was imposed upon the baseball club to protect those patrons seated in all portions of the stands from a thrown or batted ball, some form of netting or barrier would need to be erected to protect fans, which would diminish the view of all patrons, even where the risk of getting struck by a ball was remote.[9]

¶ 7 But Appellant was not struck by a ball thrown in the course of game play. Appellant was struck by a ball thrown into the stands after play had ended for the half-inning. The Majority seemingly finds no distinction between a ball thrown in play and one thrown outside of play. Apparently, in the Majority's view, a thrown ball is a thrown ball. Unlike the Majority, I believe there is a distinction between a ball thrown within the confines of the game and one thrown for a purely gratuitous purpose. I also believe the law recognizes this distinction. In fact, *Jones,* the case *Romeo* so heavily relied upon, itself made a distinction between the circumstances under which a fan was struck by a batted ball.

abolished in Pennsylvania, save for statutory exceptions. *Hughes* continued on with a *Jones* no-duty analysis because the legislature had specifically reserved assumption of the risk as to ski slope operators. Thus, there is no basis for reading the Supreme Court's application of the *Jones* no-duty analysis to the facts of *Hughes* as indicating that the no-duty rule had continuing viability in other contexts.

9.  Notably baseball clubs do provide protective screens between home plate and the seating area immediately behind home plate, presumably to protect patrons seated there. Query: if baseball clubs owe no duty to patrons to protect them from being struck by a batted ball can the baseball clubs remove the protective netting without fear of being sued? Can the maintenance crew ignore a rip in the netting and fix it at their leisure knowing all along that the net is provided not out of any duty but gratuitously?

¶ 8 In *Jones* a patron attending a Pittsburgh Pirates game on the opening day of Three Rivers Stadium was struck by a ball hit during batting practice while she was standing in a concourse that encircled the stadium. Three Rivers Stadium, which is no longer in existence, contained two concourses. One concourse housed restrooms and concession stands, while another concourse contained a walkway located back behind right field and had large openings from which patrons could peer out at the action on the field. Jones was walking along this right field walkway and had stopped to peer out at the playing field. Jones then turned and began to head back to the concession area when she heard a warning to "watch." When Jones turned back toward the field she was struck by a ball hit during batting practice. Jones sued the Pittsburgh Athletic Company, the owner of the Pirates, and Three Rivers Management Corporation, which managed Three Rivers Stadium, in negligence and prevailed in a jury trial. On appeal, we reversed concluding that Jones had failed to prove negligence on the part of the defendants. However, when appealed to the Supreme Court, the Supreme Court reversed our decision and reinstated the jury's verdict.

¶ 9 In discussing the "no-duty" rule, the Court stated:

> The central question, then, is whether appellant's case is governed by the "no-duty" rule applicable to common, frequent and expected risks of baseball or by the ordinary rules applicable to all other risks which may be present in a baseball stadium. To settle this question, we must determine whether one who attends a baseball game as a spectator can properly be charged with anticipating as inherent to baseball the risk of being struck by a baseball while properly using an interior walkway.

*Jones,* 394 A.2d at 551. The Court ultimately concluded that the answer to this second question was "no." Thus, in the minds of the *Jones* Court, not all batted balls were to be regarded in the same manner, and it was necessary to consider the how, where and when of being struck by the batted ball before declaring that the operator owed no duty to protect the patron from that occurrence.

¶ 10 A careful reading of *Jones*, reveals that the no-duty rule applies not just when one's injury is caused by a risk inherent to the activity, but also when the risk in question is necessary to the activity. This point is illustrated when the *Jones* Court stated: "[m]ovies must be seen in a darkened room, roller coasters must accelerate and decelerate rapidly and players will bat balls into the grandstand." *Id.* at 550–51. However, as *Jones* put it, "even in a 'place of amusement' not every risk is reasonably expected. The rationale behind the rule that the standard of reasonable care does not impose a duty to protect from risks associated with baseball, naturally limits its application to those injuries incurred as a result of risks any baseball spectator must and will be held to anticipate." *Id,* at 551. The qualification of the above sentence with the words "will be held to anticipate" reflects that not all risks associated with an activity will be immunized from liability. Reading both passages together, it can be seen that the risks that will be immunized are those that are not only inherent to the activity, but those necessary to preserve the essential nature of the activity.

¶ 11 I do not doubt that Marlon Byrd threw the ball that hit Appellant without malicious intent. It also appears to be true that there is a custom of tossing a ball into a stand as a means of providing a souvenir to fans. I am willing to accept that this custom is in place. However, I

am unwilling to accept the premise that simply because the custom is commonplace, the commonality of the custom provides blanket immunity from the way it is carried out. The majority concedes that the ball that struck Appellant was not thrown within the confines of the actual game. Nevertheless, the Majority concludes that because ball players routinely toss caught balls to fans at the end of an inning such practice is now "inextricably intertwined with the baseball experience." Majority Opinion at ——, 888 A.2d at 876. Because the Majority finds this practice inextricably intertwined with the baseball experience, they now bestow a shroud of immunity to the practice. This conclusion is erroneous for two reasons.

¶ 12 First, the Majority's reliance upon common practice to legitimize a finding of no duty contradicts a statement made in *Jones.* There the court provided the following caution: "The question of whether a risk is properly to be anticipated cannot be answered by looking to whether exposure to such risks is customary in the trade. This would permit defendant/stadium operators to avoid liability for universally prevalent negligent conditions, an undesirable result." *Id.* at 551 n. 6. Thus, the mere fact that baseball players frequently toss balls into the stands does not dictate the conclusion that a patron will be deemed to have assumed the risk of being struck by a ball purposely thrown into the stands or that no duty exists as to the manner in which the custom is carried out.

¶ 13 Secondly, imposing a duty of care into the practice of gratuitously providing a souvenir baseball to a lucky fan in no way detracts from or endangers the game being played on the field. As such, it is not necessary for the preservation of the activity to immunize the operator against the risk in question. Referring again to the quote from *Jones,* if movie houses are

made to lighten the theatres so that no one trips, the movie-going experience would be greatly diminished if not destroyed. If amusement parks are made to design roller coasters so as to eliminate all jerkiness and smooth out all changes in direction they would no longer be capable of being classified as "thrill rides" and the word "amusement" might be deleted from the term "amusement parks." But if baseball players, and their employers, are charged with exercising reasonable care in the practice of providing souvenir balls to patrons, the "Fall Classic" will remain a classic sporting contest and all those regular season and playoff games preceding it would still be played in a manner consistent with Abner Doubleday's original intent.

¶ 14 It is important to dissect the Majority's exact holding to understand the ramifications of that holding. The Majority does not hold that a duty existed to exercise ordinary caution in the practice of tossing a souvenir ball into the stands at the end of an inning, but there was a lack of evidence of a breach of that duty. The Majority holds that because baseballs routinely fly into the stands, and because it could be considered a custom for ball players to gratuitously toss a ball into the stands after actual game play has ended, The Phillies baseball club and Marlon Byrd owed "no duty" to a spectator in the stands with respect to the practice of tossing a ball into the stands. What this means is that now, absent an actual positive intent to injure, the practice of throwing a ball into the stands can be undertaken with complete immunity and in complete disregard for prudence. Now, neither context nor the actual manner in which a ball is thrown into the stands is material as no duty is owed to a spectator with respect to this practice. Extending the Majority's holding to a logical end, a baseball player can, from a mere few feet

from the stands, wind up and throw the ball as hard as he desires into the stands or in a showboating manner whip a ball around his back and, because no duty is owed to a spectator, he would be immune from liability should it predictably strike a fan and cause injury.

¶ 15 Additionally, given the Majority's rationale that the practice of providing souvenirs to fans invokes no duty because the practice is commonplace at games, where would this rationale end? Another common practice at ball games is the hot-dog or t-shirt launch. Both pro-motions/practices involve providing lucky fans with either a souvenir or a treat. The hotdog launch typically involves loading a foil wrapped hotdog into a cannon-like pro-pulsion device and launching it to waiting fans located in the stands. The t-shirt toss can be accomplished the same way, but is sometimes accomplished by employing a large slingshot. Given the Majority's anal-ysis, because these entertaining sideshows to the game are common place, when a spectator attends a game he assumes the risk of being struck by a hotdog or t-shirt propelled from one of these devices. Also, because these events could be deemed to have become inextricably intertwined with the baseball experience, the baseball clubs and those executing the giveaways have no duty to spectators in conducting them. Of course, this would mean that if one of those executing the hotdog launch impru-dently aimed at spectators seated a couple of rows into the stands they would be immune if a spectator lost an eye after getting hit nearly point blank by a foil wrapped hotdog.

¶ 16 In my view, since the act of tossing a ball to fans as a souvenir is extraneous to the game and not necessary to the playing of the game, a spectator does not "assume the risk" of being struck by a ball entering the stands for this purpose, nor is there any valid reason in law or policy to extend the immunity of the "no duty" rule to this practice. Rather, if a baseball player wants to go beyond the confines of the game and provide a gratuitous souvenir to a fan, he should be charged with the obli-gation of doing it in a reasonably safe and prudent manner. Here, there is certainly evidence from which a factfinder might conclude that the manner in which Byrd threw the ball into the stands was impru-dent.[10] Thus, a question of material fact remains and the motion for summary judg-ment should have been denied and the case should have proceeded to trial.

10. Although it does not appear that the Ma-jority's analysis is premised upon a lack of evidence, the Majority seems to hedge its po-sition some by asserting in footnote 4 that there was a lack of evidence that Byrd threw the ball in a forceful manner. I cannot agree. Although Appellant was not watching Byrd when Byrd threw the ball that struck him, if Appellant's allegations are true, the ball struck Appellant with sufficient force to break his eyeglasses, bloody his face and cause a concussion. Thus, basic physics indicates that the ball was thrown with considerable force. Moreover, a statement of Appellant's companion indicates that Byrd threw the ball hard in overhand fashion.