OPINION SUMMARY
MISSOURI COURT OF APPEALS—EASTERN DISTRICT
DIVISION ONE

| | | |
|---|---|---|
| CARLY MUNOZ, | ) | No. ED111118 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | Case No: 20SL-CC04478 |
| | ) | |
| SIX FLAGS ST. LOUIS, LLC d/b/a SIX | ) | |
| FLAGS ST. LOUIS and JOHN/JANE DOE, | ) | Honorable Stanley J. Wallach |
| | ) | |
| Respondents. | ) | FILED:  June 20, 2023 |

Introduction

Carly Munoz (Munoz) appeals from the grant of summary judgment in favor of Six Flags

St. Louis, LLC d/b/a Six Flags St. Louis and John/Jane Doe (collectively Six Flags) on Munoz's

negligence claim. The trial court granted Six Flags' motion for summary judgment based on

assumption of the risk due to the nature of the event, *i.*e., actors scaring guests during the park's

annual Fright Fest. Munoz appeals the trial court's ruling, alleging she was denied her right to

trial by jury where there are factual disputes regarding the cause of the injuries she sustained

during the event. We affirm.

Factual and Procedural Background

On October 19, 2019, Munoz attended Six Flags' Fright Fest with her cousin. Before

attending Fright Fest, the Six Flags' annual Halloween-themed event, Munoz understood

characters in the park would try to scare her. She knew and appreciated she would get surprised,

startled, scared, and frightened and also understood people could have different and

unpredictable reactions whenever they got surprised, frightened, startled, or scared.

On the day of her injury, Munoz arrived at the park with her cousin around 8:00 p.m. and

her injury occurred around 11 p.m.  In that three-hour period before her injury, Munoz had seen

and encountered characters in the park who tried to scare and startle her. On at least 10 different occasions, she also saw characters interact with other guests and she saw guests scream and sometimes run after they encountered the characters. Everything Munoz witnessed in the hours before her injury was what she expected to occur at Fright Fest. She never expressed feeling uncomfortable, unsafe, or in danger, and in fact was having fun and did not want to leave.

Munoz recalled she was injured while she was walking toward the Mr. Freeze ride when a clown jumped out in front of her "out of nowhere" and started "chasing" after 10-15 other guests in that area, and then everyone in that area started to run. However, when asked to explain specifically what occurred, Munoz testified the clown was actually only six feet away from her when it popped out and moved toward her when she turned and ran away. Munoz confirmed she never actually looked back to see if the clown was "chasing" her. Munoz believed it was about 10 seconds after she started running that she tripped on a curb and injured herself. Similarly, Munoz's cousin testified she did not perceive the clown to be interacting with them. Munoz's cousin believed the clown to be "fast walking" or running toward another group of people near them. Munoz's cousin did not know if the clown actually made any movements or actions toward them before they started running. Munoz's cousin, like Munoz, never looked back to see if the clown was "chasing" them before Munoz's injury.

On August 27, 2020, Munoz filed her lawsuit against Six Flags[1] in which she alleged defendant Doe (a still-unidentified individual), "dressed as a frightening clown[,] appeared and purposefully scared a crowd of approximately fifteen to twenty people." She further alleged Six Flags or its employee Doe "failed to conduct actor activities in a safe manner," including failing

---

[1] The lawsuit was originally filed by and through Munoz's next friend Jill Munoz, who was discharged from serving as next friend after Munoz turned 18; Munoz then proceeded as the named plaintiff on her own behalf.

to "cease chasing guests once a group of guests began stampeding," failing to warn of or maintain a safe premises free of "dangerous stampedes of people," and failing to direct or train actors in a manner that kept guests safe.

On August 15, 2022, Six Flags filed its motion for summary judgment, arguing an implied primary assumption of the risk barred Munoz's alleged negligence claims against Six Flags. Specifically, Six Flags argued it could not be held liable because Munoz's injury arose out of the very acts and occurrences she knew about, expected, and personally witnessed while at Fright Fest before her injury. Therefore, the risk of being injured by running away after being frightened was inherent in Munoz's decision to attend and remain at the event.

On October 12, 2022, the trial court granted Six Flags' motion finding 1) there was no evidence the scare actor actually chased Munoz, and 2) the scare actor's actual movements were immaterial because Munoz was injured by actions she knew about and expected when she attended Fright Fest. The trial court found "characters at Fright Fest are expected to take action to frighten patrons, and [Munoz] testified that is what she expected." The trial court further found the summary judgment record was not sufficient to establish the scare actor was negligent; rather, the record showed Munoz voluntarily exposed herself to the inherent risks she knew before attending the event, which included risks related to her own actions or reactions, and those of other guests, associated with running. This appeal follows.[2]

<u>Standard of Review</u>

Our review of summary judgment is essentially *de novo*. <u>Reddick v. Spring Lake Est. Homeowner's Ass'n</u>, 648 S.W.3d 765, 773 (Mo. App. E.D. 2022). We will affirm the trial court's grant of summary judgment if there is no genuine issue of material fact and the moving

---

[2] Additional facts relevant to Munoz's point on appeal will be included, as needed, in the discussion section below.

party is entitled to judgment as a matter of law.  Id.; ITT Comm. Fin. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 380 (Mo. banc 1993); Rule 74.04(c)(6).

A material fact is one from which the right to judgment flows.  Green v. Fotoohighiam, 606 S.W.3d 113, 115 (Mo. banc 2020).  A defending party may establish a right to judgment by showing "(1) facts negating any one of the non-movant's elements; (2) that the non-movant, after an adequate period of discovery, has not been able and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the non-movant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense."  Ferbet v. Hidden Valley Golf and Ski, Inc., 618 S.W.3d 596, 603 (Mo. App. E.D. 2020).  To establish a genuine issue of material fact, the non-moving party must show "the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts."  Almat Builders and Remodeling, Inc. v. Midwest Lodging, LLC, 615 S.W.3d 70, 78 (Mo. App. E.D. 2020) (describing a genuine issue as one that is "real" and not merely "argumentative, imaginary or frivolous."). "Conclusory allegations are not sufficient to raise a question of fact in summary judgment proceedings. Additionally, mere speculation does not create a genuine issue of material fact; rather, the record must demonstrate factual questions that would permit a reasonable jury to return a verdict for the non-moving party."  Day Advertising, Inc. v. Hasty, 606 S.W.3d 122, 134 (Mo. App. W.D. 2020) (citing Midwest Coal, LLC ex rel. Stanton v. Cabanas, 378 S.W.3d 367, 374 (Mo. App. E.D. 2012)).  In reviewing the grant of summary judgment, we view the record in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences.  McNearney v. LTF Club Operations Co., Inc., 486 S.W.3d 396, 399 (Mo. App. E.D. 2016).

Discussion

In her sole point on appeal, Munoz argues the trial court erred in granting summary judgment in Six Flags' favor, claiming there was sufficient evidence to create a genuine dispute as to whether Munoz impliedly assumed the risk of participating in the themed event where guests are frightened because the court failed to consider the interactions of Munoz with the scare actor, which were not inherent to the activity. Alternatively, Munoz contends even if she assumed the risk of falling and injuring herself by attending the event, Six Flags increased or altered that risk when the scare actor chased after the group surrounding Munoz. We disagree on both grounds.

The implied primary assumption of the risk doctrine states "if a person voluntarily consents to accept the danger of a known and appreciated risk, that person may not sue another for failing to protect him from it." Coomer v. Kansas City Royals Baseball Corp., 437 S.W.3d 184, 191 (Mo. banc 2014). The participant "is deemed to have assumed the risk of injury from the inherent risks of an activity that are known and understood." Ferbet, 618 S.W.3d at 606. "When the risk arises from the circumstances (e.g., from a condition on the defendant's property or the inherent nature of the defendant's activity), 'implied primary assumption of the risk' completely bars recovery by a plaintiff who knowingly and voluntarily encounters that risk." Coomer, 437 S.W.3d at 192 (citing Krause v. U.S. Truck Co., Inc., 787 S.W.2d 708, 711-12 (Mo. banc 1990)). The defendant is not liable "for injuries stemming from such inherent risks because no duty is owed as to those risks." Ferbet, 618 S.W.3d at 606 (quoting Coomer, 437 S.W.3d at 197). However, the defendant "still owes a duty of reasonable care not to alter or increase such inherent risks." Id. (quoting Coomer, 437 S.W.3d at 197-98). Inherent risks are "structural or involved in the constitution or essential character" of the activity in question; they

are something "belonging by nature or settled habit." Coomer, 437 S.W.3d at 202. A "particular risk cannot be 'structural' or 'involved in the constitution or essential character of something' one day but not the next." Id. at 201. "Once a risk is determined to be 'inherent' in something, it will remain so until there is a fundamental change in that thing's constitution or essential character." Id. The mechanism of injury can determine whether a particular risk was inherent to the activity. Id. at 202-03.

Courts generally apply this doctrine to bar claims for injuries resulting from recreational or sporting activities because the providers of these activities cannot eliminate their inherent risks. For example, in Loughran v. The Phillies, 888 A.2d 872, 876-77 (Pa. Super. 2005), a Philadelphia Phillies centerfielder intentionally threw a baseball into the stands after catching the final out of the top of the seventh inning. Id. at 874. That ball struck and injured a spectator. Id. The Loughran court suggested that, although it is not formally part of the game of baseball, players tossing balls to fans between half innings is a customary part of the game. Id. at 875-76.

In Coomer, the Missouri Supreme Court analyzed whether a baseball fan being struck by a hotdog thrown by a team's mascot was an inherent risk of attending a baseball game. The Missouri Supreme Court distinguished the activity in Loughran—a player throwing a ball into the stands—with an activity unconnected to the game of baseball—a mascot throwing hotdogs into the stands:

> Baseball is the reason centerfielder Marlon Byrd was there, just as it was the reason the fans were in the stands (including the many who were yelling for Byrd to toss the ball to them). Here, on the other hand, there is no link between the game and the risk of being hit by [the Royals' mascot's] hotdog toss. The Hotdog Launch is not an inherent part of the game; it is what the Royals do to entertain baseball fans when there is no game for them to watch.

Coomer, 437 S.W.3d at 202-03. Just as baseball was the reason the fans were in the stands in Loughran, here, "fright" was the reason Munoz was attending Fright Fest. Unlike the risk posed

6

by the Royals' hotdog-throwing mascot, the risk that a Fright Fest scare actor might cause a guest like Munoz to run and fall was inherent to the event, and Munoz knew, appreciated, and voluntarily accepted that risk before and during her attendance. Similarly, in Loughran, the Pennsylvania Superior Court recognized there was an undeniable link between attending the game and the risk of being hit with a ball tossed into the stands. Loughran, 888 A.2d at 876. Therefore, the mechanism of injury—a ball being tossed into the stands— was inherent to the overall experience and not limited to when the ball was in play. Id.[3] In contrast, the Coomer court recognized the tossing of a hotdog by a baseball team's mascot was not inherently linked to the game of baseball; instead, the "[plaintiff] and his 12,000 rain-soaked fellow spectators were not there to watch [the mascot] toss hotdogs; they were there to watch the Royals play baseball." Coomer, 437 S.W.3d at 203.

The implied primary assumption of the risk doctrine has been applied to other sports, such as skiing and snowtubing. For example, in Bennett v. Hidden Valley Golf & Ski, Inc., 318 F.3d 868 (8th Cir. 2003), the court applied Missouri law and found that risks posed by a mogul or tree on a ski slope were inherent to the sport of skiing. Id. at 873-75. The court concluded a skier voluntarily assumed "the risks inherent in or incidental to skiing, regardless of her subjective knowledge of those risks." Id. at 877. "'Implied primary assumption of the risk' bars a plaintiff from recovery when the plaintiff has knowingly and voluntarily encountered risk that is inherent in the nature of the defendant's activity." Ferbet, 618 S.W.3d at 606 (citing Coomer,

---

[3] In Dalton v. Jones, 260 Ga. App. 791, 581 S.E.2d 360, 362 (2003), the court rejected claims against a fielder who tossed a ball into the stands between innings based on similar reasoning: "Whether the ball was thrown or tossed during an inning of play or between innings lacks legal significance because, as the trial court noted, 'this throw occurred during a time which was necessary to the playing of the game, during which time the Plaintiff has assumed the risk of injury from bats, balls, and other missiles.'" See also Pira v. Sterling Equities, Inc., 16 A.D.3d 396, 790 N.Y.S.2d 551 (2005) (dismissing claims by fan injured when pitcher tossed ball into stands between innings).

437 S.W.3d at 192). "The plaintiff's consent relieves the defendant of any duty to protect the plaintiff from injury and as a result, the defendant cannot be negligent." Id. (citing Coomer, 437 S.W.3d at 193); see also Lewis v. Snow Creek, Inc., 6 S.W.3d 388, 395-96 (Mo. App. W.D. 1999) ("If the risks of the activity are perfectly obvious or fully comprehended, plaintiff has consented to them and defendant has performed his or her duty.").

In Ferbet, plaintiff brought a negligence action against Hidden Valley Ski Resort after he broke his leg while riding a rubber inner tube down a snow and ice covered hill on the resort's property. Id. at 599. Plaintiff argued his injuries and damages were caused by Hidden Valley's negligent maintenance and operation of the tubing hill and the release was unenforceable as against public policy. Id. However, the trial court disagreed and granted summary judgment in favor of the resort, finding the release-of-liability contract signed by plaintiff at the time of purchasing his snowtubing ticket was enforceable. Id. On appeal, this Court considered whether the record supported plaintiff's claim that the ski resort's alleged negligence enhanced any inherent risks involved in snowtubing on an uneven sliding surface. Id. at 607. There, the record did not describe the size or configuration of the sliding surface, or of any alleged "riprap" or crevice where the injury occurred. Id. The record also was largely silent concerning the resort's care and maintenance of the surface, whether the resort was aware of any risks, or whether there had been any prior similar incidents. Id. In addition, this Court differentiated between a known and understandable risk of "an uneven area that simply adds to snow tubers' thrill by pitching them up, and occasionally out, of the tube," as opposed to "a divot that repeatedly and unexpectedly catches and fractures customers' limbs." Id. The Court recognized that while the latter likely exceeded the inherent risk that is part of snowtubing's structure and essence, the record did not contain sufficient evidence showing any alleged negligence which enhanced the

8

inherent risks involved in the activity.  Id.  For the purposes of assumption of risk, however, the Court concluded an uneven sliding surface and the potential risks it creates for snow tubers are inherent risks of snowtubing because they are structural to the activity and involve the essential character of snowtubing.  Id. at 608.  Under such circumstances, the Court held the resort owed plaintiff no duty for the injury he sustained when his foot became lodged in a crevice on the tubing hill, and thus the release of liability provision was inapplicable and irrelevant because uneven sliding surfaces were an inherent risk to snowtubing.  Id.

Here, the summary judgment record is similarly sparse, and the evidence presented is not sufficient to support a finding that Six Flags or its scare actor was negligent by "chasing"[4] Munoz.  Munoz testified she knew about, comprehended, and expected scare tactics that could result in her or other guests screaming or running away.  Indeed, for three hours before her injury, Munoz witnessed frightened patrons running from scare actors. These undisputed facts show Munoz knew and appreciated the risk that Fright Fest actors might also scare her into running.  She personally witnessed it happening for several hours before her injury and yet chose to continue participating in the event.  Just as the courts in Coomer and Ferbet applied the implied primary assumption of the risk doctrine, the trial court here correctly concluded Munoz's injury was caused by an inherent risk of attending Fright Fest.  Six Flags cannot take the fright

_____

[4] Six Flags' corporate representative who was responsible for training the scare actors testified that Six Flags' "characters are specifically instructed not to chase individuals in the park as part of their training but they are informed . . . to interact with guests and move towards them to interact with them." She explained the specific "number of steps is not a hard and fast rule." "What we like to do is what we call the two-step.  We can lunge towards them, you can move in their direction quickly, and then you stop." She further explained that the two-step demonstration "is more like a sort of a guideline for [actors] that they're supposed to move toward a guest and then stop."  And even if permitted, "chasing" would be something "difficult to define especially in a classroom setting." Besides this testimony, the summary judgment record does not contain expert opinions discussing any standard of care for haunted attractions to follow; likewise, there are no expert opinions that the scare actor here violated Six Flags' training or any other standards.

9

out of Fright Fest, just as baseball teams cannot remove their bats and balls without fundamentally changing the game. Coomer, 437 S.W.3d at 196. In the instant case, experiencing fright, which could in turn cause running and thereafter a fall leading to injury, was inherent to the Fright Fest event. Ferbet, 618 S.W.3d at 608. Before deciding to go to Fright Fest, and for three hours after arriving there, Munoz knowingly and voluntarily accepted these risks. In recognizing these facts and applying them to the law, the trial court correctly found Munoz knowingly and voluntarily encountered the specific risk that injured her. Therefore, Six Flags owed Munoz no duty to prevent the fright which caused her to run.

Additionally, Munoz's argument that there is a genuine issue of material fact as to whether the scare actor "chased" her in violation of park policy, thereby precluding summary judgment, is unavailing. Neither Munoz nor her cousin identified facts which would support an inference that the actor was "chasing" them or the group around them. Munoz testified she saw people in the other group turn around and start to run "a little bit before [she] turned around"; she could not describe the interaction, other than to say she turned and started running, and she was in the middle of or slightly outside the group. She testified the scare actor "popped out," after which Munoz "started running, and there [were] people surrounding [her] from almost every angle" until she fell after approximately 10 seconds. Importantly, she stated she never actually looked back to see if the scare actor was truly engaged in a "chase" after Munoz turned and ran. The testimony of Munoz's cousin is equally unhelpful. She testified she never saw the scare actor interacting with her or Munoz but instead she saw the scare actor focusing on a nearby group of people. Moreover, Munoz's cousin was unable to say whether the scare actor made any movement or took any action toward her or Munoz before they started running. And, like Munoz, she never looked back to see if the scare actor was actually "chasing" them before the

10

injury occurred. Taken together, all the facts in the summary judgment record do not support an inference that Munoz was being chased and, therefore, the trial court did not err in granting Six Flags judgment as a matter of law. As discussed above, Munoz's injury was caused by the inherent risk she assumed, and not by any allegedly negligent act on the part of Six Flags or its scare actor. Merely alleging a defendant was negligent is not enough to overcome the implied primary assumption of the risk doctrine; instead, the alleged negligence must have changed the outcome. See Bennett, 318 F.3d at 873-75 (the risks of trees and moguls were inherent to the sport of skiing; therefore, the defendant owed no duty under the implied primary assumption of the risk doctrine without direct evidence that the defendant negligently maintained or exacerbated the condition that caused a skiing accident).

But even if there were a chase, it is not material. A defendant's duty in situations involving an implied assumed risk is only to "make conditions as safe as they appear to be." Martin v. Buzan, 857 S.W.2d 366, 369 (Mo. App. E.D. 1993). "If the risks of the activity are perfectly obvious or fully comprehended, plaintiff has consented to them and defendant has performed his or her duty. Plaintiff's consent is implied from the act of electing to participate in the activity." Id. (internal citations omitted). Here, Munoz knew of and accepted the risk of being around other guests who were likely to run from Fright Fest actors, something she witnessed and was "perfectly obvious" to her for three hours before she was injured. Therefore, the mechanism of the injury—guests running after becoming scared—was or became an inherent risk that Munoz was aware of. Just as the plaintiff in Bennett could not show the ski resort owed a duty to protect against inherent skiing risks like trees and moguls, or the plaintiff in Ferbet could not demonstrate that uneven sliding surfaces were anything other than an inherent risk to snowtubing, here, Munoz cannot show that Six Flags owed a duty to prevent her injury because

11

the risk of injury was inherent to Munoz and other patrons becoming frightened by a Fright Fest scare actor and running away. Bennett, 318 F.3d at 873-75; Ferbet, 618 S.W.3d at 608.

Finally, while we found no Missouri cases involving assumption of the risk and "haunted" attractions, courts in other jurisdictions have found the attraction operators have no duty to protect a patron from her own reaction to scares that occurred within the confines of the attraction. In Griffin v. The Haunted Hotel, Inc., 242 Cal. App. 4th 490 (2015), the California court applied the same test Missouri courts apply for assumption of risk as a bar to recovery. Id. at 501. There, the haunted attraction was an outdoor trail where actors jumped out of dark spaces holding scary props, such as knives, axes, chainsaws, or severed body parts. Id. at 493. At the end of the attraction, and after passing what the plaintiff believed was the exit, an actor performed a "Carrie effect" scare and confronted the plaintiff unexpectedly to give "one more extreme fright." Id. at 493-94. This was delivered by an actor wielding a gas-powered chainsaw (the chain had been removed), who approached the plaintiff, frightened him, and then chased the plaintiff as he ran away. Id. The plaintiff was terrified and felt physically unsafe because he thought he had already left the attraction. Id. at 496. After a chase, the plaintiff tripped, fell, and broke his wrist. Id. He then sued the operator of the haunted attraction, alleging negligence and assault. Id. at 493. The Griffin court affirmed summary judgment, noting that all scare activities occurred within the defendant's boundaries, even though the plaintiff was not aware of that fact. Id. at 497. Though the plaintiff believed he had gone through an exit, he was still within the "scary experience he purchased" and purposefully attended. Id. at 498. Importantly, the court found whether the plaintiff thought he was still in the attraction was not relevant to establish the defense, which was simply that he decided to attend the attraction knowing he could be frightened and then could run and fall at any time. Id. at 509. Munoz argues Griffin is

12

distinguishable because there, guests had been warned they might be chased, and employees understood chasing was part of the attraction. But whether chasing occurred was not the determining factor in <u>Griffin</u>, just as it is not here. In both cases, it was the fact that the plaintiffs had already agreed to accept any risk they might be frightened, run, and fall at the venue. As the <u>Griffin</u> court explained,

> [T]he very purpose of The Haunted Trail is to frighten patrons. Haunted Hotel informed patrons the event had "high impact scares." Patrons in a Halloween haunted house are expected to be surprised, startled, and scared by the exhibits. That is what Griffin paid money to experience. At bottom, his complaint here is Haunted Hotel delivered on its promise to scare the wits out of him.

<u>Id</u>. at 508. The court concluded that because the plaintiff "voluntarily paid money to experience" getting scared, the attraction owed him no duty. <u>Id</u>. Likewise, here, Munoz knew beforehand—and accepted—the risk that she might be frightened and run, which in turn could lead to falling and becoming injured at Fright Fest. Six Flags owed Munoz no duty as a matter of law. Other "haunted house" cases have reached similar conclusions.

In <u>Mays v. Gretna Athletic Boosters, Inc.</u>, 668 So.2d 1207 (La. Ct. App. 1996), a Louisiana case,[5] a patron inside a haunted house was injured when someone scared her, causing her to run into a cinder block wall. <u>Id</u>. at 1208. The court found the operator had no duty to protect the patron from running into a wall in a dark room: "Patrons in a Halloween haunted house are expected to be surprised, startled and scared by the exhibits but the operator does not have a duty to guard against patrons reacting in bizarre, frightened and unpredictable ways." <u>Id</u>. at 1209. In <u>Galan v. Covenant House New Orleans</u>, 695 So.2d 1007 (La. Ct. App. 1997), the plaintiff believed she had exited a haunted house when a character startled her with a chainsaw and caused her to fall in alarm. <u>Id</u>. at 1008. She argued the haunted house operator was

---

[5] We note that while Louisiana courts do not apply the implied primary assumption of risk test, they are still instructive.

13

negligent but the court disagreed, noting again that haunted house patrons expect "to be surprised, startled and scared by the exhibits," such that the operator had no duty to guard against patrons reacting in unpredictable ways. Id. Finally, in Durmon v. Billings, 873 So.2d 872 (La. Ct. App. 2004), a patron inside a "haunted" cornfield maze was approached by a costumed character with a running chainsaw (from which the chain was removed). Id. at 879. The patron attempted to run away, but she fell and injured herself. Id. The court found the owners of the maze owed no duty to the patron to warn or protect her from her reaction to being frightened by a costumed character, "an experience she expected to have and for which she paid an *additional* admission fee." Id.

Here, just as the cases cited from other jurisdictions, Munoz knew "characters at Fright Fest are expected to take action to frighten patrons," and knew the risk that frightened guests might run away and fall. In other words, she was aware of the risk she encountered, and expected to be surprised, startled, and scared. Griffin, 242 Cal. App. 4th at 508; Galan, 695 So.2d at 1008; Durmon, 873 So.2d at 879; Mays, 668 So.2d. at 1209. Munoz knew frightened guests might run, which could lead to falling and which in turn could lead to injury. Whether or not the actor "chased" Munoz is not the determining factor. Munoz was exposed to the exact risk she knowingly and voluntarily exposed herself to by attending and remaining at Fright Fest for three hours. Munoz was an active participant in the festivities and understood the known and inherent risks in it, including the risk of injury. Case law from Missouri and other states concludes that when a person is injured during such activities, summary judgment is proper because they assumed such risks. Therefore, based on the record, the trial court did not err in awarding summary judgment to Six Flags as there was no duty to prevent Munoz's injury, which was caused by an inherent risk of attending and remaining at Fright Fest. Point denied.

14

Conclusion

The Judgment is affirmed.

SHERRI B. SULLIVAN, J.

Angela T. Quigless, P.J., and
Robert M. Clayton III, J., concur.

15