

# SUPREME COURT OF MISSOURI
## en banc

JOHN COOMER, )
)
      Appellant, )
)
vs. )     No. SC93214
)
KANSAS CITY ROYALS )
BASEBALL CORPORATION, )
)
      Respondent. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### The Honorable W. Brent Powell, Judge

*Opinion issued June 24, 2014*

John Coomer claims he was injured when he was hit in the eye with a hotdog thrown by Sluggerrr, the Kansas City Royals mascot. Coomer sued the Kansas City Royals Baseball Corporation, claiming the team is responsible for Sluggerrr's negligence and the damages it caused. A jury found in favor of the Royals, and Coomer appeals. Among the jury instructions was one asking the jury to decide whether the risk of being injured by Sluggerrr's hotdog toss is one of the inherent risks of watching a Royals home game that Coomer assumed merely by attending. Whether a particular risk is inherent in watching a sporting event is a question of law for the court, not a question of fact for the jury. This Court holds that the risk of being injured by Sluggerrr's hotdog toss is not one of the inherent risks of watching a Royals home game.

In the past, this Court has held that spectators cannot sue a baseball team for injuries caused when a ball or bat enters the stands. Such risks are an unavoidable – even desirable – part of the joy that comes with being close enough to the Great American Pastime to smell the new-mown grass, to hear the crack of 42 inches of solid ash meeting a 95-mph fastball, or to watch a diving third baseman turn a heart-rending triple into a soul-soaring double-play. The risk of being injured by Sluggerrr's hotdog toss, on the other hand, is not an unavoidable part of watching the Royals play baseball. That risk is no more inherent in watching a game of baseball than it is inherent in watching a rock concert, a monster truck rally, or any other assemblage where free food or T-shirts are tossed into the crowd to increase excitement and boost attendance.

Accordingly, Coomer's claim is not foreclosed by the assumption of the risk doctrine. Instead, it is up to the jury to decide: (1) whether Sluggerrr injured Coomer by hitting him with a hotdog, and (2) whether Sluggerrr was negligent in doing so. If so, the jury is entitled to hold the Royals liable for Coomer's damages, and the jury is entitled to reduce those damages by whatever percentage of fault the evidence shows should be assessed to Coomer. Because the jury instructions given below introduced an improper consideration into this otherwise ordinary analysis, the Court vacates the judgment in favor of the Royals and remands this case.

## Background

Coomer is a longtime baseball fan and frequent spectator at Royals games in Kauffman Stadium. On September 8, 2009, he brought his father along to watch the Royals host the Detroit Tigers. Only about 12,000 people were on hand to watch the

game because it had rained most of the day.  With such a small crowd, Coomer and his father left their assigned seats early in the game and moved to empty seats six rows behind the visitor's dugout.

Shortly after Coomer changed seats, Sluggerrr mounted the visitor's dugout to begin the "Hotdog Launch," a feature of every Royals home game since 2000.  The launch occurs between innings, when Sluggerrr uses an air gun to shoot hotdogs from the roof of the visitor's dugout to fans seated beyond hand-tossing range.  When his assistants are reloading the air gun, Sluggerrr tosses hotdogs by hand to the fans seated nearby.  Sluggerrr generally tossed the hotdogs underhand while facing the fans but sometimes throws overhand, behind his back, and side-armed.

Coomer estimates that he attended 175 Royals games before this game in September 2009.  He admits that he frequently watched Sluggerrr toss hotdogs from the roof of the visitor's dugout and, on September 8, he saw Sluggerrr mount the dugout to begin the Hotdog Launch.  Coomer and his father were seated approximately 15 to 20 feet from Sluggerrr, directly in his view.  After employing his hotdog-shaped airgun to send hotdogs to distant fans, Sluggerrr began to toss hotdogs by hand to fans seated near Coomer.  Coomer testified that he saw Sluggerrr turn away from the crowd as if to prepare for a behind-the-back throw, but, because Coomer chose that moment to turn and look at the scoreboard, he admits he never saw Sluggerrr throw the hotdog that he claims injured him.  Coomer testified only that a "split second later … something hit me in the face," and he described the blow as "pretty forceful."

Coomer did not report this incident to the Royals when it happened because he did not realize he had been injured. Instead, he stayed for most of the rest of Tuesday's game (a thrilling 7-5 effort that snapped the first-place Tigers' six-game winning streak) and even returned to Kauffmann Stadium the following night to witness the Royals' further 5-1 drubbing of the Tigers. Thursday morning, however, Coomer felt he was "seeing differently" and something "wasn't right" with his left eye. The problem progressed until, approximately eight days after the incident, Coomer saw a doctor and was diagnosed with a detached retina. Coomer underwent surgeries to repair the retina and to remove a "traumatic cataract" in the same eye.

Coomer reported his injury to the Royals in September 2009, eight days after it occurred. In February 2010, Coomer filed this lawsuit alleging one count of negligence and one count of battery.[1] Regarding the negligence count, Coomer asserted that the Royals (through its employee, Sluggerrr) failed to exercise ordinary care in throwing hotdogs into the stands, that the team failed to adequately train Sluggerrr on how to throw hotdogs into the stand safely, and that the team failed to adequately supervise Sluggerrr's hotdog toss. In its answer, the Royals admitted responsibility for Sluggerrr's acts but denied he had been negligent. The Royals also asserted affirmative defenses of assumption of the risk and comparative fault.

The Royals employee who portrays Sluggerrr testified at trial he did not remember the throw that allegedly injured Coomer. He admitted that the Royals had given him no

---

[1] The trial court dismissed the battery claim in a partial summary judgment, and Coomer does not appeal that dismissal.

4

specific training on how to toss hotdogs, but testified that he was aware that fans could be hurt and that he was careful in making his tosses. For example, when a fan is seated nearby, Sluggerrr said he tries to make eye contact before tossing a hotdog so that the fan will know it is coming and – if the fan is seated near enough – tries to throw the hotdog in an arc to make it easier to catch. In addition to hearing Sluggerrr's testimony and Coomer's description of the incident, the jury heard testimony from another fan who claimed to have been injured by a hotdog toss from Sluggerrr under similar circumstances.

At the close of the evidence, Coomer moved for a directed verdict on the issues of comparative fault and assumption of the risk. He argued that implied primary assumption of the risk "only applies to risks that are inherent in the nature of the activity" and, in this case, "the harm of getting hit with a hotdog has absolutely no relationship to going to a baseball game." Regarding comparative fault, Coomer argued that, as a matter of law, he cannot have been negligent merely for not fleeing his seat during the Hotdog Launch. The trial court overruled Coomer's motion, holding that both (a) whether the risk of being injured by Sluggerrr's hotdog toss is one of the risks inherent in watching a Royals game and (b) the reasonableness of Coomer's actions were proper questions for the jury.

In preparing the jury instructions, the Royals proposed adding a "tail" to Instruction No. 9 (i.e., the verdict director for Coomer's negligence claim). This tail directs the jury to Instruction No. 11, which asks the jury to decide whether injury from Sluggerrr's hotdog toss is an inherent risk of watching the Royals play baseball. The Royals' proposed instructions, as given, read:

### Instruction No. 9

In your verdict you must assess a percentage of fault to the defendant if you believe:

> First, defendant's employee threw a hotdog that hit plaintiff; and
>
> Second, defendant's employee was thereby negligence [sic], and
>
> Third, as a direct result of such negligence plaintiff sustained damage,

unless you believe plaintiff is not entitled to recover by reason of Instruction No. 11.

### Instruction No. 11:

In your verdict you must not assess a percentage of fault to defendant if you believe:

> First, the risk of suffering an injury by being struck by a hotdog thrown in a manner in which Sluggerrr threw the hotdog that plaintiff alleges struck him was a risk inherent in attending a game at Royals' Stadium, and
>
> Second, plaintiff comprehended the actual risk, and
>
> Third, plaintiff intelligently accepted the risk.

Coomer objected to Instruction No. 11 (and to the tail on Instruction No. 9 directing the jury to that instruction) on the same grounds raised in his directed verdict motion. In addition, Coomer objected to the Royals' proposed comparative fault instruction,[2] arguing that there was insufficient evidence to submit this issue to the jury. The trial court overruled Coomer's objections.

---

[2] Instruction No. 12 submitted comparative fault to the jury as follows:

> In your verdict you must assess a percentage of fault to plaintiff if you believe:
> First, either:
>> plaintiff observed the manner in which the "Hotdog Launch" was being conducted on September 8, 2009, and with such knowledge, he stayed in the area where the "Hotdog Launch" was being conducted, or

The jury returned a verdict in favor of the Royals. The verdict form states that the jury assessed zero percent of fault to the Royals and 100 percent of fault to Coomer, but it does not disclose the basis for this decision. Coomer moved for judgment notwithstanding the verdict and for a new trial based on the arguments asserted in his directed verdict motion and in his objections to the jury instructions. The trial court overruled Coomer's motions and entered judgment for the Royals. Coomer appeals and, after granting transfer, this Court has jurisdiction. *See* Mo. Const. art. V, § 10.

## Standard of Review

This Court reviews claims of instructional error *de novo*. *Hervey v. Missouri Dept. of Corrections*, 379 S.W.3d 156, 159 (Mo. banc 2012). The Court will not vacate a judgment on the basis of such an error, however, unless that error materially affected the merits of the action. *Id.* Accordingly, "the party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to the party challenging the instruction." *Id.* (citation omitted).

## Analysis

This case presents the question of whether the century-old affirmative defense commonly referred to as "assumption of the risk" survived this Court's adoption of comparative fault in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983). To the extent

---

plaintiff unreasonably failed to appreciate the risks associated with the manner in which the "Hotdog Launch" was being conducted on September 8, 2009, and
Second, plaintiff, in any one or more of the respects submitted in paragraph First, was thereby negligent, and
Third, such negligence of plaintiff directly caused or directly contributed to cause any damage plaintiff may have sustained.

7

it survives, Coomer claims that the application of this doctrine is to be decided by the court and not the jury. The Court agrees. Because the trial court erred in submitting the question of assumption of the risk to the jury, the judgment in this case must be vacated and the matter remanded.

## I. *Assumption of the Risk in a post-*Gustafson *World*

It is safe to say that judicial analysis and application of assumption of the risk doctrine has not always achieved high marks for clarity and precision. Historically, courts often failed to draw or maintain important distinctions between this doctrine and defenses such as contributory negligence, which, though they may have seemed similar to assumption of the risk, were quite different. Simons, *Reflections on Assumption of Risk*, 50 UCLA L. Rev. 481, 486 (2002) ("*Reflections*"). Admittedly, those distinctions seldom made any difference as a practical matter because any of these often-overlapping defenses was sufficient to bar completely all recovery by the plaintiff. At least this was so before the advent of comparative fault. Because *Gustafson* rejects the complete defense of contributory negligence in favor of the partial defense of comparative fault, greater precision is required when analyzing claims of assumptions of the risk.

The assumption of the risk doctrine was a relative late-comer in the law of negligence. *See* William Prosser, *HANDBOOK OF THE LAW OF TORTS*, at 376 (1941) (hereinafter, "*PROSSER ON TORTS*") (identifying 1809 as the earliest use of the defense in a negligence action). The basic principle of this defense is easily stated: if a person voluntarily consents to accept the danger of a known and appreciated risk, that person may not sue another for failing to protect him from it. *See Ross v. Clouser*, 637 S.W.2d

8

11, 14 (Mo. banc 1982) (recovery is barred when the plaintiff "comprehended the actual danger and intelligently acquiesced in it").  In practice, however, this principle proved easier to state than to apply.

The simplest application of this doctrine recognizes that, when a plaintiff makes an express statement that he is voluntarily accepting a specified risk, the plaintiff is barred from recovering damages for an injury resulting from that risk.  This application (i.e., "express assumption of the risk") most often involves a written waiver or release by the would-be plaintiff, but it can be based on any form of any explicit acquiescence. *PROSSER ON TORTS*, at 376; *Reflections*, 50 UCLA L. Rev. at 486-87.

In most cases, however, the plaintiff's consent cannot be proved so easily.  There, the defendant contends that the plaintiff's voluntary acceptance of a known and appreciated risk should be inferred from the plaintiff's conduct and the surrounding circumstances.  *PROSSER ON TORTS*, at 376.  Though the distinction seldom was noted before the adoption of comparative fault, this category of implied – rather than expressed – assumption of the risk includes two very different applications of this doctrine: "implied primary assumption of the risk" and "implied secondary assumption of the risk."  The difference between these applications is the type – or, more precisely, the source – of the risk at issue.  *Reflections*, 50 UCLA L. Rev. at 487-89.

When the risk arises from the circumstances (e.g., from a condition on the defendant's property or the inherent nature of the defendant's activity), "implied primary assumption of the risk" completely bars recovery by a plaintiff who knowingly and voluntarily encounters that risk.  *Krause v. U.S. Truck Co., Inc.*, 787 S.W.2d 708, 711-12

9

(Mo. banc 1990); *Reflections*, 50 UCLA L. Rev. at 487-88. When the risk is created by defendant's negligence, on the other hand, this has been identified as "implied secondary assumption of the risk." *Lewis v. Snow Creek, Inc.*, 6 S.W.3d 388, 395 (Mo. App. 1999); *Reflections*, 50 UCLA L. Rev. at 489. Understandably, courts were less willing to bar all recovery in the latter circumstance unless the plaintiff not only knowingly and voluntarily acquiesced in the risk created by the defendant's negligence but also acted unreasonably in doing so. *Id.*

Accordingly, prior to the advent of comparative fault, a plaintiff's claim was barred completely by assumption of the risk if the plaintiff (a) expressly consented to assume a known and understood risk (i.e., "express assumption of the risk"); (b) implicitly consented (based on his conduct and surrounding circumstances) to assume a known and understood risk that was not created by the defendant's own negligence (i.e., "implied primary assumption of the risk"); or (c) implicitly consented (based on his conduct and surrounding circumstances) to assume a known and understood risk that resulted from the defendant's own negligence, provided that the plaintiff acted unreasonably in doing so (i.e., "implied secondary assumption of the risk"). Though all three were lumped together under the heading of assumption of the risk and treated as affirmative defenses, only the latter application was properly viewed as such.

The version of comparative fault adopted by this Court in *Gustafson* fundamentally altered this landscape. Section 1(a) of the Uniform Comparative Fault Act (the "UCFA") provides that "any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable

10

to the claimant's contributory fault, but does not bar recovery." *Gustafson*, 661 S.W.2d at 18 (quoting from the UCFA, which is set forth in full in an appendix to that opinion). Section 1(b) of the UCFA defines "fault" for purposes of section 1(a) to include "unreasonable assumption of risk not constituting an enforceable express consent." *Id.*

As a result, *Gustafson*, rejects any further application of "implied secondary assumption of the risk." When a plaintiff acts unreasonably in deciding to assume a risk created by a defendant's negligence, such "fault" may reduce – but not bar – the plaintiff's recovery under *Gustafson*. By the same token, when the plaintiff's decision was reasonable, it cannot be used to reduce his recovery because reasonable behavior does not constitute "fault" under the UCFA. *Reflections*, 50 UCLA L. Rev. at 489 (noting that the "predominant modern position" of most courts and the Restatement (Third) of Torts is that secondary implied assumption of the risk has be assimilated into comparative fault).

But *Gustafson* does not reject or abandon "express assumption of the risk." Though this application of the assumption of the risk doctrine always has been subject to certain limitations as a matter of public policy,[3] *Gustafson* and the adoption of comparative fault have no effect on this application or its limitations. This is because, in

---

[3] When considering a claim of express assumption of the risk, language in a document offered by a defendant as evidence of the plaintiff's "consent" must be "clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence." *Alack v. Vic Tanny Int'l of Missouri, Inc.*, 923 S.W.2d 330, 337 (Mo. banc 1996). The presence or absence of ambiguity in such a writing is a question for the court to decide as a matter of law. *Id.* Moreover, even when the plaintiff consents unambiguously in writing, this Court will refuse to enforce such consent in some situations because "one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest." *Id.*

an "express assumption of the risk" case, the plaintiff's consent relieves the defendant of any duty to protect the plaintiff from injury. As a result, the defendant cannot be negligent and there is no "fault" to which the jury can compare the plaintiff's fault. *Gustafson*, 661 S.W.2d at 18 ("fault" does not include "enforceable express consent").

By the same token, *Gustafson* has no effect on the continued viability of "implied primary assumption of the risk." *Gustafson*, 661 S.W.2d at 20 ("the term ["fault"] does not include … a lack of violation of duty by the defendant (as in the failure of a landowner to warn a licensee of a patent danger on the premises)"). This is because, under the law of Missouri and most other jurisdictions, implied primary assumption of the risk "is *not really an affirmative defense*; rather, it indicates that the defendant *did not even owe the plaintiff any duty of care*." *Krause*, 787 S.W.2d at 711-12 (emphasis added).[4] With no duty to protect the plaintiff, the defendant cannot be negligent and there is no "fault" for the jury to compare under comparative fault principles.

Missouri's characterization of the implied primary assumption of the risk doctrine in terms of "duty" is decidedly mainstream:

> Like express assumption of the risk, "'primary' implied assumption of the risk …. is really a principle of no duty, or no negligence, and so denies the existence of any cause of action."

---

[4] *See also Harris v. Niehaus*, 857 S.W.2d 222, 227 (Mo. banc 1993) (even after comparative fault, the open and obvious nature of the risks is an issue for the court to use "*in determining a possessor of land's standard of care*") (emphasis added); *Sheppard v. Midway R-1 Sch. Dist.*, 904 S.W.2d 257, 261-62 (Mo. App. 1995) ("Implied primary assumption of risk, like express assumption of risk, relates to the initial issue of *whether the defendant had a duty* to protect the plaintiff") (emphasis added); *Lewis*, 6 S.W.3d at 395-96 ("if the plaintiff's injury is the result of a risk inherent in the sport in which he was participating, the defendant is relieved from liability on the grounds that by participating in the sport, the plaintiff assumed the risk and the *defendant never owed the plaintiff a duty* to protect him from that risk") (emphasis added).

12

W. Page Keeton, *PROSSER AND KEETON ON TORTS*, at 496-97 (5th ed. 1984).[5]

Accordingly, when the plaintiff is injured by the defendant's negligence, this Court holds that the adoption of comparative fault in *Gustafson* precludes any consideration of the plaintiff's conduct in assuming that risk (i.e., implied secondary assumption of the risk) except as a partial defense under a proper comparative fault instruction. Conversely, because the "express" and "implied primary" applications of assumption of the risk result in determinations that the defendant has no duty to protect the plaintiff, the form of comparative fault adopted in *Gustafson* does not preclude these applications as a complete – not merely a partial – bar to the plaintiff's recovery.

## II.     *Implied Primary Assumption of the Risk and the "Baseball Rule"*

One of the most interesting – and certainly the most relevant – applications of implied primary assumption of the risk involves certain risks assumed by spectators at sporting events. Long before the Kansas City Athletics moved to Oakland and the fledging Royals joined the Junior Circuit, an overwhelming majority of courts recognized that spectators at sporting events are exposed to certain risks that are inherent merely in watching the contest. Accordingly, under what is described above as implied primary assumption of the risk, these courts held that the home team was not liable to a spectator injured as a result of such risks. *See* Augustine, *Who Is Responsible When Spectators Are*

---

[5]   *See also Neinstein v. Los Angeles Dodgers, Inc.*, 185 Cal. App. 3d 176, 184, (1986) (deciding as a matter of law that "Dodgers were under **no duty** to do anything further to protect her from that [foul ball] hazard") (emphasis added); *Friedman v. Houston Sports Ass'n*, 731 S.W.2d 572, 575 (Tex. App. 1987) (deciding as a matter of law that "stadium owner has **no duty** to warn spectators of the danger of foul balls") (emphasis added); *When Spectators Are Injured*, 2008 Den. U. Sports & Ent. L.J. at 42-46 (collecting cases).

*Injured While Attending Professional Sporting Events?*, 2008 Den. U. Sports & Ent. L.J.

39, 42-46 (2008) ("*When Spectators Are Injured*").

The archetypal example of this application of implied primary assumption of the

risk is when a baseball park owner fails to protect each and every spectator from the risk

of being injured by a ball or bat flying into the stands.  Just as Missouri teams have led

(and continue to lead) professional baseball on the field, Missouri courts helped lead the

nation in defining this area of the law off the field.  More than 50 years ago, this Court

was one of the first to articulate the so-called "Baseball Rule:"

> [W]here a baseball game is being conducted under the customary and usual
> conditions prevailing in baseball parks, ***it is not negligence to fail to
> protect all seats in the park by wire netting***; and that the special
> circumstances and specific negligence pleaded did not aid plaintiff or
> impose upon the defendant a duty to warn him against hazards which are
> necessarily incident to baseball and are perfectly obvious to a person in
> possession of his faculties.

*Anderson v. Kansas City Baseball Club*, 231 S.W.2d 170, 172 (Mo. 1950) (emphasis

added).[6]

*Anderson* was based on this Court's earlier decision in *Hudson v. Kansas City*

*Baseball Club*, 164 S.W.2d 318, 320 (Mo. 1942), which used the "no duty" language of

implied primary assumption of the risk to explain its holding:

> The basis of the proprietor's liability is his superior knowledge and if his
> invitee knows of the condition or hazard ***there is no duty*** on the part of the
> proprietor to warn him and there is no liability for resulting injury because

---

[6]  This "no duty" or "limited duty" rule for claims by baseball spectators has been dubbed the
Baseball Rule and has been adopted by every court to consider it, save one.  *Benejam v. Detroit
Tigers, Inc.*, 635 N.W.2d 219, 221 (2001(Mich. App.) ("review of precedents from other
jurisdictions finds overwhelming, if not universal, support for the limited duty rule," and noting
that the contrary decisions in Illinois were overruled by statute).

> the invitee has as much knowledge as the proprietor does and then by voluntarily acting, in view of his knowledge, assumes the risks and dangers incident to the known condition.

*Hudson*, 164 S.W.2d at 323 (emphasis added) (applying Restatement (Second) of Torts,

§ 343). *Hudson* involved a spectator with personal knowledge of the inherent risk of

being injured by a foul ball while watching a baseball game. But, when the Court

returned to this same issue eight years later in *Anderson*, it continued to rely on section

343 of the Restatement (Second) of Torts (i.e., the "open and obvious dangers" doctrine

under the rules of premises liability) to extend Missouri's no-duty rule to cases involving

baseball spectators with no prior knowledge of baseball or the risks inherent in watching

it.

> All of the cases cited here and many others which are cited in *Hudson v. Kansas City Baseball Club, supra*, emphasize that when due care has been exercised to provide a reasonable number of screened seats, there remains a hazard that spectators in unscreened seats may be struck and injured by balls which are fouled or otherwise driven into the stands. ***This risk is a necessary and inherent part of the game*** and remains after ordinary care has been exercised to provide the spectators with seats which are reasonably safe. It is a risk which is assumed by the spectators because it remains after due care has been exercised and is not the result of negligence on the part of the baseball club. It is clearly ***not an unreasonable risk to spectators which imposes a duty*** to warn [or protect].

*Anderson*, 231 S.W.2d at 173 (emphasis added).[7]

---

[7] This use of an objective standard based on what a defendant reasonably can expect, rather than a subjective standard based on what a plaintiff actually knew and understood, is one of the key distinctions between the primary and secondary varieties of implied assumption of the risk that went unnoticed until comparative fault. It also explains why, before comparative fault, the former was decided by the court as a question of the defendant's "duty," while the latter was usually decided by the jury as an affirmative defense. As noted above, *Gustafson* merges the latter into the jury's consideration of comparative fault but leaves the former to be decided by the court just as before. *See Harris*, 857 S.W.2d at 227 (notwithstanding Court's adoption of

15

*Anderson* and *Hudson* are just two of the many dozens of cases[8] around the country holding that, as long as some seats directly behind home plate are protected, the team owes "no duty" to spectators outside that area who are injured by a ball or bat while watching a baseball game.[9] Despite being decided by such different courts across so many decades, all of these cases reflect certain shared principles. First, it is not possible for baseball players to play the game without occasionally sending balls or bats (or parts of bats) into the stands, sometimes at unsafe speeds. Second, it is not possible for the home team to protect each and every spectator from such risks without fundamentally altering the game or the spectators' experience of watching it through such means as: (a) substituting foam rubber balls and bats that will not injure anyone (or be very fun to watch); (b) erecting a screen or other barrier around the entire field protecting all

---

comparative fault, "open and obviousness of a condition [continues] as a consideration *for the court* in determining a possessor of land's standard of care") (emphasis added).

[8] *See* Zitter, *Liability to Spectator at Baseball Game Who Is Hit by Ball or Injured as Result of Other Hazards of Game—Failure to Provide or Maintain Sufficient Screening*, 82 A.L.R.6th 417 (2013) (*superseding* Rigelhaupt, *Liability to spectator at baseball game who is hit by ball or injured as result of other hazards of game*, 91 A.L.R.3d 24 (1979), and *Liability to spectator at baseball game who is hit by a ball or injured as result of other hazards of the game*, 142 A.L.R. 868 (1943)) ("*Liability to Spectator*").

[9] This "limited duty" to screen only certain seats is an anachronism, far less meaningful today than in the days before box seats, season tickets, and sellout crowds. As one court noted:

> Were we deciding this issue without the precedent … we would not be persuaded that there is a need to impose a duty to provide *any* screened seats. A person who fears injury always has the option of refraining from attending a baseball game or of sitting in a part of the park which is out of reach of balls traveling with sufficient velocity to cause harm. ***In any event, the duty seems to be one of little practical value. The injured person is always going to be one who is seated in an unscreened area*** and, who … would be precluded from recovering regardless of the reason why he or she elected to sit there.

*Los Angeles Dodgers*, 185 Cal. App. 3d at 182 (emphasis added).

16

spectators while obstructing their view and making them feel more removed from the action; or (c) moving all spectators at least 600 feet away from home plate in all directions.[10] Third, ordinary negligence principles do not produce reliably acceptable results in these circumstances because the risk of injury (and the extent of the harm) to spectators is substantial,[11] yet the justification for not protecting spectators from that risk can be expressed only in terms of the amusement or entertainment value of watching the sport that brought the spectators to the stadium in the first place.[12]

Against this background, *Anderson* and *Hudson* (and dozens of Baseball Rule cases around the country) represent a conscious decision to favor the collective interests of all spectators by rejecting as a matter of law the individual claims of injured spectators. Using the rules of premises liability and the rationale now identified as implied primary assumption of the risk, these decisions protect the home team from liability for risks that are inherent in watching a baseball game based on the team's failure to take steps that

---

[10] *Los Angeles Dodgers*, 185 Cal. App. 3d at 181 ("As we see it, to permit plaintiff to recover under the circumstances here would force baseball stadium owners to do one of two things: place all spectator areas behind a protective screen, thereby reducing the quality of everyone's view, and since players are often able to reach into the spectator area to catch foul balls, changing the very nature of the game itself; or continue the status quo and increase the price of tickets to cover the cost of compensating injured persons with the attendant result that persons of meager means might be 'priced out' of enjoying the great American pastime.")

[11] One study found injuries from foul balls in major league ballparks occur at a rate of 35.1 injuries per million spectator visits. *See When Spectators Are Injured*, 2008 Den. U. Sports & Ent. L.J. at 39 n.3. For teams like the Royals, with more than 1.7 million in home attendance each season, this equates to approximately 60 injured fans per year.

[12] As one court noted, the "logical result of having these [baseball] cases governed by usual invitor-invitee principles of liability [without adjusting for "open and obvious" risks] would be that warned against in *Akins*: '[E]very spectator injured by a foul ball, no matter where he is seated or standing in the ball park, would have an absolute right to go to the jury on every claim of negligence.'" *Detroit Tigers, Inc.*, 635 N.W.2d 219, 224-25 (Mich. App. 2001) (*quoting Akins v. Glen Falls City Sch. Dist.*, 424 N.E.2d at 534).

17

could defeat the reason spectators are there at all, i.e., to get as close as they can to the action without interfering with the game they came to watch.[13]

But the rationale for this rule – and, therefore, the rule itself – extends only to those risks that the home team is powerless to alleviate without fundamentally altering the game or spectator's enjoyment of it.  As a result, the solid wall of authority in support of the Baseball Rule is badly cracked in cases where a spectator is injured by a ball **when** the game is not underway or **where** fans ordinarily do expect to have to keep a careful lookout for balls or bats leaving the field.[14]  This Court has not had to address such a question and does not do so now.

---

[13]  *See Detroit Tigers*, 635 N.W.2d at 222 ("there is inherent value in having most seats unprotected by a screen because baseball patrons generally want to be involved with the game in an intimate way and are even hoping that they will come in contact with some projectile from the field (in the form of a souvenir baseball)."); *Rudnick v. Golden W. Broadcasters*, 156 Cal. App. 3d 793, 802 (1984) ("Reasonable screening is defined in the expectations of the fans and the traditions of the national pastime itself" because "the chance to apprehend a misdirected baseball is as much a part of the game as the seventh inning stretch or peanuts and Cracker Jack"); *Akins*, 424 N.E.2d at 533 ("many spectators prefer to sit where their view of the game is unobstructed by fences or protective netting and the proprietor of a ball park has a legitimate interest in catering to these desires"); *Liability to Spectator*, 82 A.L.R.6th at 417 ("Part of the experience of attending a baseball game is that many of the dozens of baseballs used in each game are hit out of play into foul territory, into the backstop and screens, and into the stands. Most fans would love to return from a game with a souvenir of the actual play, and some even bring gloves with them in the hope of making a catch.").  *See also Murphy v. Steeplechase Amusement Co.*, 166 N.E. 173, 174 (N.Y. 1929) (Cardozo, C.J.) ("One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball. … The timorous may stay at home.").

[14]  *See, e.g.*, *Maisonave v. Newark Bears Prof'l Baseball Club, Inc.*, 881 A.2d 700, 709 (N. J. 2005) (deciding as a matter of law that, "in areas outside of the stands, including concourses and mezzanines such as the one in this appeal, a commercial sports facility is no different than any other commercial establishment, and we do not hesitate to apply general negligence principles"); *Jones v. Three Rivers Mgmt. Corp.*, 394 A.2d 546, 551 (Pa. 1978) (deciding as a matter of law that "one who attends a baseball game as a spectator [cannot] properly be charged with anticipating as inherent to baseball the risk of being struck by a baseball while properly using an interior walkway").  *But see Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1177 (Nev.

Moreover, even though the "no duty" rationale of the Baseball Rule applies to risks inherent in watching a baseball game, the home team still owes a duty of reasonable care not to *alter or increase* such inherent risks.[15]  One example, useful both for its facts and its analysis, is *Lowe v. California League of Prof. Baseball*, 56 Cal. App. 4th 112 (1997).  There, the court began by explaining this "no duty" rationale:

> In the first instance, foul balls hit into the spectators' area clearly create a risk of injury.  If such foul balls were to be eliminated, it would be impossible to play the game.  Thus, foul balls represent an inherent risk to spectators attending baseball games.  Under *Knight,* such risk is assumed.

*Id*. at 123 (*citing Knight v. Jewett*, 834 P.2d 696, 698 (Cal. 1992)).

In *Lowe*, however, even though the plaintiff was struck by a foul ball, he claimed that his injuries were not caused by that inherent risk.  Instead, the plaintiff claimed he was prevented from watching for foul balls because he was repeatedly jostled and

---

2008) (barring claim as a matter of law because spectator was injured while eating in concession area because "primary implied assumption of risk doctrine merely goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff," which is a question for the court); *Loughran v. The Phillies*, 888 A.2d 872 (Pa. Super. Ct. 2005) (holding as a matter of law that, even though risk of being injured by a ball tossed into the stands during a break in the game was not part of the sport of baseball, such risks were inherent in watching professional baseball games because such "activities [by players] have become inextricably intertwined with a fan's baseball experience"); *Sparks v. Sterling Doubleday Enterprises, LP.*, 752 N.Y.S.2d 79, 80 (2002) (holding as a matter of law that team owed no duty beyond screening seats behind home plate and was not liable to member of high school band hit during batting practice while waiting to participate in pre-game ceremonies on opening day).

[15]  *Edward C. v. City of Albuquerque*, 241 P.3d 1086, 1097-98 (N.M. 2010) ("vast majority of jurisdictions that have addressed the issue" hold that spectators "must exercise ordinary care to protect themselves from the inherent risk of being hit by a projectile that leaves the field of play and the owner/occupant must exercise ordinary care not to increase that inherent risk"); *Knight v. Jewett*, 834 P.2d 696, 708 (Cal. 1992) ("Although [stadium owners] generally have no legal duty to eliminate (or protect a [spectator] against) risks inherent in the sport itself, it is well established that [owners] generally do have a duty to use due care not to increase the risks ... over and above those inherent in the sport.").

19

distracted by the team's dinosaur mascot.  The court agreed that the Baseball Rule did not

bar such a claim:

> **[*T*]he key inquiry here is whether the risk which led to plaintiff's injury**
> **involved some feature or aspect of the game which is inevitable or**
> **unavoidable in the actual playing of the game**. … Can [this] be said about
> the antics of the mascot?  **We think not**.  Actually, the … person who
> dressed up as Tremor, recounted that there were occasional games played
> when he was not there.  In view of this testimony, as a matter of law, we
> hold that the antics of the mascot are not an essential or integral part of the
> playing of a baseball game.  In short, the game can be played in the absence
> of such antics.

*Id*. (emphasis added).

Accordingly, even though implied primary assumption of the risk precludes

recovery for injuries caused by the inherent risk of being hit by a foul ball while watching

a baseball game, *Lowe* holds that the jury can hold the team liable for such injuries if the

negligence of its mascot altered or increased that otherwise inherent risk and this

negligence causes the plaintiff's injuries.  *See also Sheppard*, 904 S.W.2d at 263-64

(even though the student cannot sue under implied primary assumption of the risk for

injuries resulting from inherent risk of a bad landing in high school long-jump contest,

the jury can hold the school district liable when the inherent risk of a bad landing was

altered or increased by defendant's negligence in preparing the landing pit and this

negligence caused the student's injuries).[16]

---

[16]  The Royals seek to distinguish *Sheppard* on the ground that it concerns participants rather
than spectators.  This distinction is more apparent than real, however, because the implied
primary assumption of the risk always is evaluated in term of participants.  Baseball Rule cases,
therefore, evaluate the inherent risks assumed by all who participate in the activity of watching a
baseball game.  True, those risks are different from the ones assumed by those who participate in
the activity of playing baseball, but that is not a sufficient basis to ignore well-researched and

Accordingly, the proper application of implied primary assumption of the risk in this case – unaffected by *Gustafson* – is this: if Coomer was injured by a risk that is an inherent part of watching the Royals play baseball, the team had no duty to protect him and cannot be liable for his injuries. But, if Coomer's injury resulted from a risk that is not an inherent part of watching baseball in person – or if the negligence of the Royals altered or increased one of these inherent risks and caused Coomer's injury – the jury is entitled to hold the Royals liable for such negligence and, to the extent the reasonableness of Coomer's actions are in dispute, the jury must apportion fault between the parties using comparative fault principles. This approach has been used in Missouri and around the country.

> Therefore, in the sports context, under comparative fault, if the plaintiff's ***injury is the result of a risk inherent in the sport in which he was participating, the defendant is relieved from liability*** on the grounds that by participating in the sport, the plaintiff assumed the risk and the defendant never owed the plaintiff a duty to protect him from that risk. ***If, on the other hand, the plaintiff's injury is the result of negligence on the part of the defendant***, the issue regarding the plaintiff's assumption of that risk and whether it was a reasonable assumption of risk, is ***an element of fault to be compared to the defendant's negligence*** by the jury.

*Sheppard*, 904 S.W.2d at 263-64 (emphasis added).

---

clearly written appellate decisions. Somewhat inconsistently, the Royals also argue that this Court should follow *Sheppard* and allow the jury to decide the application of implied primary assumption of the risk. The Court already has held that this issue is to be decided as a matter of law, however, and the issue in *Sheppard* was causation, not inherent risk. A properly drafted verdict director is all that is needed to present the issue of causation, not a separate and likely confusing instruction regarding implied primary assumption of the risk.

### III.   *Implied Primary Assumption of the Risk is a Question of Law*

To this point, it appears that the Royals are in at least tacit agreement with the Court's analysis. The Royals invoke the doctrine of implied primary assumption of the risk by name and contend that, under this doctrine, it owed no duty to protect Coomer from the risk of injury from Sluggerrr's hotdog toss because that is an inherent risk Coomer assumed by attending a Royals game at Kauffman Stadium. The Royals contend, however, that the question of which risks qualify as "inherent risks" for purposes of implied primary assumption of the risk is a question of fact for the jury to decide, not the court. The Court disagrees.

As explained above, the doctrine of implied primary assumption of the risk negates any duty the defendant otherwise may have owed the plaintiff. The question of whether and to what extent the defendant owes a duty to the plaintiff is always a question for the court, not the jury. *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005). This principle is no less applicable when the question of duty arises in the context of implied primary assumption of the risk. *See Krause*, 787 S.W.2d at 711-12 (under Missouri law, implied primary assumption of the risk "is not really an affirmative defense; rather, it indicates that the defendant did not even owe the plaintiff any duty of care"); *Harris*, 857 S.W.2d at 227 (holding that, even after *Gustafson*, the open and obvious nature of the risks is an issue for the court to use "in determining a possessor of land's standard of care").

This answer is even clearer when the doctrine of implied primary assumption of the risk arises in the context of claims by spectators at a sporting event. In such cases,

this and others consistently have held that the question of whether a particular risk is or is not an inherent part of watching the event is to be decided by the court as a matter of law. *See Anderson*, 231 S.W.2d at 173 (holding as a matter of law that the risk of injury from a foul ball is "clearly not an unreasonable risk to spectators which imposes a duty to warn [or protect]"); *Hudson*, 164 S.W.2d at 323 (holding as a matter of law that, "if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury"). *See also Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 534 (N.Y. 1981) (rejecting view that the extent of the team's duty should be left to the jury because it "would mean that every spectator injured by a foul ball, no matter where he is seated or standing in the ball park, would have an absolute right to go to the jury on every claim of negligence"); *When Spectators Are Injured*, 2008 Den. U. Sports & Ent. L.J. at 42-46 (collecting cases holding, as a matter of law, that the team owed no duty to injured spectators).[17]

   *Anderson*, *Hudson*, and similar implied primary assumption of the risk cases around the country answer this "inherent risk" question as a matter of law because, if that question is left to each separate jury in each separate case, a team would never know for sure what duty it owes to its spectators. For example, under the Royals' approach,

---

[17] When the court determines that the risk is not an inherent one and, therefore, that implied primary assumption of the risk does not apply, the question of whether the plaintiff was injured by the defendant's negligence remains a jury question. *See Sheppard*, 904 S.W.2d at 263-64 (school cannot be liable as a matter of law for injuries from inherent risk of a long-jumper's bad landing, but it was a question for the jury whether jumper's injuries were caused by school's negligence in preparing the landing pit); *Lowe*, 56 Cal. App. 4th at 123 (team cannot be held liable for spectator's injuries from inherent risk of being hit by foul ball, but it was a question for the jury whether spectator's injuries were caused by team's negligence in allowing mascot to bump and distract fans during the game).

23

Sluggerrr could throw two consecutive hotdogs in precisely the same manner, hit two spectators causing precisely the same injuries, and the Royals could be held liable for all or some part of one spectator's damages and escape all liability for the other spectator's damages solely because the latter jury found the risk of injury from Sluggerrr's hotdog toss to be an "inherent risk" and the former jury did not. Such conflicting results are unacceptable.

The reason courts – not juries – decide what duty a defendant owes is to ensure that all similarly situated defendants are treated equally and, more importantly, to give notice of these duties so that potential defendants will have an opportunity to adjust their conduct accordingly. These principles of fair notice and equal treatment are fundamental values in our legal system. Courts are well positioned to serve and protect such values; juries are not. *See Prosser and Keeton on Torts*, at 236 (noting that "it is no part of the province of the jury" to weigh the considerations of precedent and sound public policy that inform decisions regarding the existence and extent of a defendant's duty of care).

The Royals' argument that juries should determine whether a particular risk is inherent simply in watching the game fails at an even more fundamental level. A question of fact is submitted to a jury in a civil case if, but only if, the evidence regarding that fact is such that reasonable jurors may reach contradictory conclusions. Here, the dispute between the Royals and Coomer concerning whether the risk of injury from Sluggerrr's hotdog toss is one of the risks that is inherent in watching the Royals play baseball is a policy debate, not an evidentiary one. To the extent there was any evidence at trial relevant to this debate, that evidence was not specific to Coomer, or to his decision

24

whether to attend this specific game and where to sit, or to similar decisions made by the 12,000 other spectators in the park that day. Instead, the evidence – and, more importantly, the policy debate itself – will be the same in every case. The only thing that will change is the jury (and potentially, under the Royals' approach, the jury's answer).

Juries decide disputed questions of material fact, e.g., questions such as what the plaintiff or defendant (or others around them) did or did not do, what the circumstances surrounding this conduct were, and what the consequences of this conduct have been. Such questions may be difficult to answer, but there is a right and wrong answer for the jury to pursue. The question of whether being injured by Sluggerrr's hotdog toss is a risk inherent in watching a Royals home game, on the other hand, has no right or wrong answer. It is a conclusion *about* a fact, not a fact itself. Juries do not decide such questions; courts do.

Finally, even the word "inherent" defies the Royals' case-by-case approach. For a risk to be "inherent," it must be "*structural* or involved in the *constitution or essential character of* something: belonging *by nature or settled habit*." *Webster's Third New International Dictionary* (1966), at 1163 (emphasis added). A particular risk cannot be "structural" or "involved in the constitution or essential character of something" one day but not the next. Under this definition, once a risk is determined to be "inherent" in something, it will remain so until there is a fundamental change in that thing's constitution or essential character.

In *Hudson* and *Anderson*, the Court decided that the risk of a spectator being injured by a foul ball at a baseball game was an inherent risk, i.e., that it was "structural"

25

or "involved in the constitution or essential character" of watching baseball.  This is why the Court's determinations in those cases were made as a matter of law, not fact, and this is why those determinations have properly been binding on all similar claims since they were made.  As a result, the Court must approach the risk of being injured by Sluggerrr's hotdog toss the same way.   Either that risk is "structural" and "involved in the constitution or essential character" of watching a Royals game or it is not.  It cannot be both, any more than this Court can allow one jury to say it is and the next jury to say it is not.

Accordingly, this Court holds that the question of whether a risk is "inherent" for purposes of the doctrine of implied primary assumption of the risk is not a question for the jury.  As a result, the question of whether being injured by Sluggerrr's hotdog toss is an "inherent risk" of watching a Royals home game must be answered as a matter of law.

IV.     *Being Injured by Sluggerrr's Hotdog Toss is Not a*
        *Risk Inherent in Watching Royals Baseball*

The Royals admit that, "[s]trictly speaking, this is not a baseball rule case" because Coomer does not claim he was injured by a foul ball or loose bat.  But, because it claims the Hotdog Launch is a "common sense" activity, the Royals contend that the same implied primary assumption of the risk rationale should apply and bar all recovery by Coomer.  According to the Royals, the risk to a spectator of being injured by Sluggerrr's hotdog toss shares the same essential characteristics as the other risks that this Court (and many others) determined long ago were inherent in watching a baseball game

26

in person, i.e., risks that a spectator will be injured by a flying ball or bat. The Court disagrees.

The rationale for barring recovery for injuries from risks that are inherent in watching a particular sport under implied primary assumption of the risk is that the defendant team owner cannot remove such risks without materially altering either the sport that the spectators come to see or the spectator's enjoyment of it. No such argument applies to Sluggerrr's hotdog toss. Millions of fans have watched the Royals (and its forebears in professional baseball) play the National Pastime for the better part of a century before Sluggerrr began tossing hotdogs, and millions more people watch professional baseball every year in stadiums all across this country without the benefit of such antics.

Some fans may find Sluggerrr's hotdog toss fun to watch between innings, and some fans may even have come to expect it, but this does not make the risk of injury from Sluggerrr's hotdog toss an "inherent risk" of watching a Royals game. As noted above, "inherent" means "*structural* or involved in the *constitution or essential character of* something: belonging *by nature or settled habit*," *Webster's Third New International Dictionary* (1966), at 1163 (emphasis added). There is nothing about the risk of injury from Sluggerrr's hotdog toss that is "structural" or involves the "constitution or essential character" of watching a Royals game at Kauffman Stadium.

The Royals concede that Sluggerrr's hotdog toss has nothing to do with watching the game of baseball but contend that the Hotdog Launch is a well-established (even customary) part of the overall stadium "experience." In support, the Royals cite cases

that have applied the Baseball Rule to risks that were not created directly from the game. These cases do not support the Royals' argument.

In *Loughran v. The Phillies,* 888 A.2d 872 876-77 (Pa. 2005), because a plaintiff was injured when a fielder tossed the ball into the stands after catching the last out of the inning, the court held that implied primary assumption of the risk barred the plaintiff's claims.   In rejecting the plaintiff's claim that the Baseball Rule should not apply because the throw was not part of the game itself, *Loughran* holds that – even though the "'no duty' rule applies only to 'common, expected, and frequent' risks of the game" – the link between the game and the risk of being hit with a ball tossed into the stands by a player is undeniable.  *Id*. at 876.[18]  Baseball is the reason centerfielder Marlon Byrd was there, just as it was the reason the fans were in the stands (including the many who were yelling for Byrd to toss the ball to them).  Here, on the other hand, there is no link between the game and the risk of being hit by Sluggerrr's hotdog toss.  The Hotdog Launch is not an inherent part of the game; it is what the Royals do to entertain baseball fans when there is no game for them to watch.  Sluggerrr may make breaks in the game more fun, but Coomer and his 12,000 rain-soaked fellow spectators were not there to watch Sluggerrr toss hotdogs; they were there to watch the Royals play baseball.

---

[18]   In *Dalton v. Jones,* 581 S.E.2d 360, 362 (Ga. App. 2003), the court rejected claims against a fielder who tossed a ball into the stands between innings based on similar reasoning:  "Whether the ball was thrown or tossed during an inning of play or between innings lacks legal significance because, as the trial court noted, 'this throw occurred during a time which was necessary to the playing of the game, during which time the Plaintiff has assumed the risk of injury from bats, balls, and other missiles.'"  *See also Pira v. Sterling Equities, Inc.,* 16 A.D.3d 396, 790 N.Y.S.2d 551 (2005) (dismissing claims by fan injured when pitcher tossed ball into stands between innings).

Somewhat closer to the mark – but still inapposite – is the Royals' reliance on

*Cohen v. Sterling Mets, L.P,* 17 Misc. 3d 218 (N.Y. Sup. Ct. 2007), *aff'd* 870 N.Y.S.2d

914 (N.Y. App. Div. 2009).  A vendor sued the team for injuries caused by a fan who hit

the vendor while diving for a souvenir T-shirt that had been tossed into the crowd.  The

court dismissed these claims, stating: "When a ball is tossed into the stands by a player

many spectators rush toward the ball in hopes of getting a souvenir, just as what allegedly

occurred here during the t-shirt launch."  *Id*. at 220.

The Royals' reliance on *Cohen* highlights one of the basic flaws in its effort to use

implied primary assumption to bar Coomer's claims, and it shows the importance of

correctly identifying the risks and activity in each case.  As explained above, what makes

a risk "inherent" for purposes of this doctrine – and what distinguishes such risks from

those at issue in an implied secondary assumption of the risk case – is that the risks are so

intertwined (i.e., so "structural" or involved in the "constitution or essential character")

with the underlying activity that the team cannot control or limit the risk without

abandoning the activity.  In *Cohen*, because the Mets could not control how fans reacted

to the T-shirt launch, that reaction was an inherent risk – not of watching a baseball game

but – of taking part in the T-shirt launch (which the plaintiff's work required him to

do).[19]  Here, on the other hand, not only is being injured by Sluggerrr's hotdog toss not

_____

[19]   *Lowe* also is instructive on this point.  Because the team had no ability to eliminate the risk of being hit by a foul ball without fundamentally altering the game or the fans' access to it, the team could not be liable for injuries caused by that risk.  The team was in control of its mascot, however, which is why the court held the team could be liable when the mascot's actions made the risk of injury from a foul ball greater than it was inherently.  *Lowe,* 56 Cal. App. 4th at 123. Here, the evidence was sufficient for the jury to find both that Sluggerrr was negligent and that

an inherent risk of watching a Royals game, it is not an inherent risk of the Hotdog Launch. As discussed below, the Royals concede that there are negligent *and* non-negligent ways of tossing a hotdog and that Sluggerr (for whom the Royals are responsible) can control which he uses.

Accordingly, the Court holds as a matter of law that the risk of injury from Sluggerrr's hotdog toss is not one of the risks inherent in watching the Royals play baseball that Coomer assumed merely by attending a game at Kauffman Stadium. This risk can be increased, decreased or eliminated altogether with no impact on the game or the spectators' enjoyment of it. As a result, Sluggerrr (and, therefore, the Royals) owe the fans a duty to use reasonable care in conducting the Hotdog Launch and can be held liable for damages caused by a breach of that duty.[20] Sluggerrr's tosses may – or may not – be negligent; that is a question of fact for the jury to decide. But the Royals owe the same duty of reasonable care when distributing hotdogs or other promotional

his negligence *directly* caused Coomer's injuries, eliminating any need to invoke the *Lowe* analysis of increasing an otherwise inherent risk.

[20] This observation highlights another – perhaps even more basic – flaw in the Royals' argument. From the very beginning, Baseball Rule cases holding that the home team has "no duty" to protect spectators recognized that balls and bats can go flying into the seats even though the batter, pitcher, or fielder is using reasonable care. The risk that is "inherent" in watching this game is that even careful players cannot always control the flight of the ball or keep control of the bat. To eliminate all risk of that occurring, the team's only choice is to change the game or the fans' access to it. Here, on the other hand, nothing (except the Royals) compels Sluggerrr to throw hotdogs at the spectators. Perhaps the Royals are correct and there is a non-negligent way to throw a hotdog at a patron, but safety *always* can be ensured simply by handing the food to the customer … as waiters, waitresses, and concessionaires prove millions of times every day. So, if Sluggerrr and the Royals decide to engage in the riskier conduct of throwing the food, they cannot complain that they have to persuade a jury that such conduct was reasonable anytime a fan is injured.

materials that it owes to their 1.7 million fans in all other circumstances, excepting only those risks of injury that are an inherent part of watching a baseball game in person.

## V. *The Jury Instructions Were Prejudicial*

As held above, the trial court erred in submitting to the jury the question of whether the risk of injury from Sluggerrr's hotdog toss was an inherent risk of watching a baseball game at Kauffman Stadium. The Royals contend that the jury's verdict and resulting judgment need not be vacated, however, because this instructional error did not affect the outcome of this case. The Court disagrees.

The crux of the Royals' argument is that the jury must have decided that Sluggerrr was not negligent in tossing the hotdog that injured Coomer. This is incorrect. The essence of an affirmative defense is that it precludes liability to the plaintiff that otherwise would be justified by the facts. In this case, therefore, the Royals' attempt to invoke the assumption of the risk doctrine can be paraphrased as "Sluggerrr was negligent in injuring Coomer, but Coomer is barred from recovering any damages because he knowingly and intelligently assumed the risk of such an injury." As explained above, however, the affirmative defense aspect of assumption of the risk, i.e., implied secondary assumption of the risk, did not survive the advent of comparative fault. Once the jury finds that the defendant was negligent, *Gustafson* prohibits any further inquiry into the reasonableness or unreasonableness of the plaintiff's conduct as a basis for barring the plaintiff's claim entirely. Instead, that inquiry now occurs (if at all) only in the context of comparative fault. The part of assumption of the risk that survived

31

*Gustafson*, i.e., implied primary assumption of the risk, was never an affirmative defense or a jury question, and, as explained above, it does not apply here.

The language of the instructions in this case also contradicts the Royals' argument. The Royals contend that Instruction No. 11 only permits the jury to resolve the question of assumption of the risk in its favor if the jury determines that Sluggerrr's throw was not negligent. That is not what this instruction says. It refers only to the "manner in which Sluggerrr threw the hotdog," but it does not characterize that manner or ask the jury to do so. More importantly, the jury would never have had any occasion to apply Instruction No. 11 unless and until it had found the Royals (and Sluggerrr) were negligent under Instruction No. 9. If the jury determined Sluggerrr was not negligent, Instruction No. 9 would have been the end of its analysis. But, if the jury determined that Sluggerrr was negligent under Instruction No. 9, then – and only then – would the jury have reason to consult the "tail" at the bottom of Instruction No. 9 sending it to Instruction No. 11.

The Royals also argue that the judgment should be affirmed because the jury might have entered its verdict for the Royals on another basis entirely removed from assumption of the risk. For instance, because there was no direct evidence that Coomer was injured by the hotdog Sluggerrr threw, the jury may have concluded that Coomer was not hit by the hotdog but by another fan who was reaching for the hotdog. The jury could have reached such a conclusion, of course, just as it could have based its verdict on some other factor that was not influenced by the trial court's error. But the mere possibility that an error was not prejudicial is not sufficient.

Here, the Court holds that Coomer has shown a sufficient likelihood of prejudice to justify vacating the judgment and remanding the case. Instruction No. 11 not only put an issue (implied primary assumption of the risk) to the jury that must be decided by the court as a matter of law, it created an unacceptable risk that the jury found the Royals negligent but then did not assess at least some percentage of the fault to the team because that is what the introductory phrase to Instruction No. 11 told the jury to do. Accordingly, the judgment is vacated, and the case is remanded.

## VI. *Issues that Likely Will Arise in a Retrial*

Coomer claims that the trial court erred in submitting the Royals' affirmative defense of comparative fault to the jury and in refusing to submit Coomer's alternative claims that the Royals were negligent in training and/or supervising Sluggerrr's hotdog toss. Because the judgment must be vacated and the case remanded as a result of the trial court's errors, the Court does not need to address Coomer's other claims. Given that these issues likely will recur at retrial (if there is one), however, the Court will address them here.

First, the Court holds that the evidence was sufficient to justify submitting Coomer's comparative fault to the jury. Coomer contends that, because he was "just sitting there," this cannot constitute negligence. The jury might reach that conclusion and, as a result, not attribute any percentage of the fault to Coomer. But that is not the only conclusion supported by this evidence. The evidence also was sufficient for the jury to find that Coomer acted unreasonably by: (a) watching Sluggerrr go into his leonine wind-up in preparation for a behind-the-back hotdog toss and then (b) choosing the

33

precise moment that Sluggerrr was releasing the hotdog to let his gaze – and attention – wander elsewhere.  The jury may find that this failure to keep a careful lookout, among other reasons, was sufficient to assess some percentage of fault to Coomer.

Second, Coomer contends that the trial court erred in refusing to allow him to submit multiple theories on which the jury could hold the Royals liable for his damages. The trial court did not dismiss Coomer's claims for negligent training and supervision as unsubstantiated.  Instead, citing *McHaffie v. Bunch,* 891 S.W.2d 822 (Mo. banc 1995), the trial court simply ruled that Coomer was entitled to submit one, but only one, theory on which the jury could hold the Royals liable for Sluggerrr's negligence (e.g., *respondeat superior*, negligent training, or negligent supervision).  The trial court was correct.

As explained in *McHaffie*, "once an employer has admitted respondeat superior liability … it is improper to allow a plaintiff to proceed against the employer on any other theory of imputed liability."  *Id*. at 826 (citations omitted).  The Court's rationale for this decision was that, if "all of the theories for attaching liability to one person for the negligence of another were recognized and all pleaded in one case where the imputation of negligence is admitted, the evidence laboriously submitted to establish other theories serves no real purpose."  *Id*.

The reasoning of *McHaffie* prohibits a plaintiff from going to the jury on multiple alternative theories of imputed liability.  Once the jury is told that a particular defendant is liable for the negligent actions of someone else, no purpose is served by explaining to the jury alternative ways to reach the same result.  Here, even though claims of negligent

training or supervision may not strictly be theories of imputed liability in the same way that the doctrine of *respondeat superior* is, Coomer still must show that Sluggerrr was negligent before the jury can award him any of his damages under these theories. In other words, the team may have been negligent in training or supervising Sluggerrr but, unless Sluggerrr acted wrongfully in injuring Coomer, there is no basis for the Royals' liability. Here, there was no need to explore those alternate paths. Because the Royals conceded the application of *respondeat superior*, Coomer's recovery was certain as long as he could prove Sluggerrr's negligence and causation. As there was no purpose in allowing Coomer to pursue alternative grounds for the same result, the trial court did not err in its application of *McHaffie*.

Even though the Court holds that the trial court's application of *McHaffie* was not error, it is worth noting how prejudicial this ruling was in the context of the trial court's errors regarding assumption of the risk. *McHaffie* assumes that a plaintiff does not need both a belt and suspenders when one basis of liability is established. As discussed above, however, Instruction No. 11 allowed the jury to find for the Royals even though the jury determined under Instruction No. 9 that Coomer was injured as a result of Sluggerrr's negligent conduct. Instruction No. 11, therefore, deprived Coomer of the benefit that *McHaffie* assumes is present. *McHaffie* was designed to save the time and avoid the confusion that comes with allowing a plaintiff to demand both belt and suspenders in submitting his claim to the jury. But when Instruction No. 11 improperly sliced through Coomer's belt, he was sorely prejudiced by the trial court's refusal to allow him suspenders under *McHaffie*.

If this case is tried again on remand, the instructional error will not recur and, therefore, there will be no prejudice from the proper application of *McHaffie*. If the jury finds that Sluggerrr failed to use reasonable care when he threw the hotdog at Coomer and injured him, it will assess a percentage of fault to the Royals as required by Instruction No. 9, and it will do so without the distraction and mixed-signals of Instruction No. 11. No other theory of liability will be needed by, or useful to, Coomer. Finally, if the evidence on retrial is the same as here, the jury may conclude that Coomer failed to use reasonable care to protect himself from Sluggerrr's negligence (failing to keep an adequate lookout or otherwise) and, on that basis, it could assess a percentage of fault to Coomer under a proper comparative fault instruction.

## Conclusion

For the reasons set forth above, this Court vacates the judgment and remands the case.

_____

Paul C. Wilson, Judge

All concur.

36